RUTH HARDY, PLAINTIFF-APPELLANT, AND PETER LOOS, CLARK.F. MORRIS, JR., EDWARD T. LYONS, ALBERT J. FRASCA AND JOSEPH P. O'HERN, PLAINTIFFS, v. EDWARD E. RUHNKE, SR., INDIVIDUALLY AND AS CITY CLERK OF EAST ORANGE, AND THE CITY OF EAST ORANGE, A MUNICIPAL CORPORATION, DEFENDANTS-RESPONDENTS.

Argued March 6, 1966—Decided April 4, 1966.

*Mr. Chester K. Ligham* argued the cause for plaintiff-appellant.

*Mr. William L. Brach* argued the cause for defendants-respondents.

The opinion of the court was delivered by

HALL, J. The assertion in this appeal is that the statute under which the City of East Orange has been governed since January 1, 1964, *Chapter* 149 of the *Laws of* 1963, *N. J. S. A.* Acts Saved from Repeal 40:103–5(71) through (127), or at least certain provisions thereof, is a private, special or local law regulating the internal affairs of the city prohibited by *N. J. Const.* 1947, *Art.* IV, § VII, *par.* 9(13) or otherwise invalid. We are thoroughly satisfied that it is completely legal and effective in East Orange. To make the expression of our reasons clear, we should first sketch the background of the controversy.

By referendum in June 1908, the voters of the then City of East Orange adopted a new form of government created by *Chapter* 250 of the *Laws of* 1908, *N. J. S. A.* Acts Saved

from Repeal 40:103–5(1) through (52). From then until January 1, 1964, the city functioned under that statute. The 1908 act, which, with its amendments and supplements prior to 1963, we will hereafter refer to as *Chapter* 250, was not a special charter for East Orange, but rather by its express terms a general law available to any municipality in the State which might adopt it. It was one of a number of old general statutes providing for varying forms of city government which have retained their viability by being saved from repeal when the *Revised Statutes* were enacted in 1937. See *N. J. S. A. Title* 40, *Subtitle* 8, *City Referendum Charter Acts, chapters* 103 through 112.

The distinctive feature of the *Chapter* 250 form of government, so far as pertinent, was a combination of structural details. The governing body of the city was a council composed of two members from each ward having two-year terms. The terms were staggered, with one representative of each ward elected each year. The chief excutive officer was the mayor, elected at large, likewise for a two-year term. These officials were selected on a partisan basis at the annual general election. The statute required actual residence in the city at the time of election for one to be eligible for these offices, but no period of antecedent residence was imposed. The chapter further optionally provided through additional referenda for appointive boards of water, police and fire commissioners having a very considerable amount of autonomy in the administration and day-to-day operation of these departments of government. See *City of East Orange v. Board of Water Commissioners of East Orange,* 40 *N. J.* 334 (1963). East Orange exercised this option and by 1963 these boards had been functioning for many years. *Chapter* 250 specified powers, duties, officers and procedures in great detail. It amounted to an inflexible, self-contained governmental blue print, not affected by general law. The result was that any change even in the minutiae of local government required an amendment or supplement of the basic statute. There were a goodly number of these over the years

(see the list contained in *N. J. S. A.* 40:103–5), the last before 1963 having been accomplished by *L.* 1960, *c.* 126, *N. J. S. A.* Acts Saved from Repeal 40:103–5(22.1) through (22.6). Although *Chapter* 250 required a favorable referendum vote before it could become effective in any city, it contained no provision requiring similar electoral approval with respect to amendments or supplements.

Prior to 1963 there was agitation in East Orange for some modernization of the city's government and of the underlying legislation. The upshot was the enactment of the statute in question as *Chapter* 149 of the laws of that year, *N. J. S. A.* Acts Saved from Repeal 40:103–5 (71) through (127), hereafter referred to as *Chapter* 149. Unquestionably it was sponsored by the mayor and council of the city and drafted in large part by its law department, but this fact has no bearing on its validity. It is on its face a general law, denominated a supplement to *Chapter* 250, and was passed as such. *Cf. N. J. Const.* 1947, *Art.* IV, §7, *par.* 10. In fact, it is a thorough revision of *Chapter* 250 complete within itself, retaining, however, the identical governmental structure—a mayor and ward councilmen, with essentially the same functions, elected on a partisan basis at the general election, and the three boards to administer the water, police and fire departments. The fundamental changes made from Chapter 250 were the deletion of the many rigid and detailed provisions meticulously specifying and limiting powers, duties, officers and procedures, the substitution of broad and general concepts therefor, the incorporation of general law and the inclusion of many additional modern governmental features. In many aspects the chapter followed the approach and general format of the Optional Municipal Charter Law of 1950 (Faulkner Act), *N. J. S. A.* 40:69A–1, *et seq.*

With particular reference to the controversy before us, *Chapter* 149 provided for four instead of two year terms for the mayor and councilmen, on a staggered two-year basis for councilmen. It specified that they were to be elected at general elections in which members of the state assembly are

elected, so that no municipal official would be chosen when national officials were selected. This would result in municipal elections being held biennially instead of annually. It also required two years residence in the city as of the time of election for the mayor and members of the council as well as residence of one year in the ward which a councilman was to represent.

Despite its form as a supplement, *Chapter* 149 amounts to an entirely new enactment—a new pattern of city government designed to be available to municipalities governed by other forms as well as those then or thereafter functioning under *Chapter* 250. The latter chapter remained untouched for continued use by cities then utilizing it and for municipalities operating under other forms which might later choose to adopt it. So section 56 of *Chapter* 149, *N. J. S. A.* Acts Saved from Repeal 40:103-5(126), provided that it should not become operative in *any* city until the voters thereof adopted it by referendum.[1]

The transition provisions of *Chapter* 149 give rise to the principal issue in this case. They are found in section 56(a) and (b). The two subsections distinguish as to time and method of transition in cities adopting the chapter between

---

[1] It would seem that, legally, the substance of *Chapter* 149 could have been accomplished by amendments, albeit extensive and perhaps awkward ones, of various sections of *Chapter* 250 and made effective in any city operating thereunder without the necessity of a referendum. The city argument stated at oral argument that the supplement rather than an amendment form was used at the suggestion of the staff of the state Law Revision and Legislative Services Commission on the theory that, since the proposed legislation did require a favorable referendum for effectiveness, East Orange would be without a legal form of government if the amendment method were used and the result of a referendum were negative. It is not necessary that we express any opinion thereon.

The reason for the drafting of *Chapter* 149 in the form of a supplement rather than as an independent enactment would seem to be that the transition provision about to be mentioned refers to *Chapter* 250. No attack on *Chapter* 149 is made on any claim that it is invalid because not in reality supplemental in character.

those governed at the time under *Chapter* 250 and those then governed by some other form.

Section 56 (a), which plaintiff particularly claims is an inhibited local law, deals with transition where the city adopting *Chapter* 149 was then governed by *Chapter* 250, thereby already having the same elective offices (mayor and ward councilmen) chosen at the general election on a partisan basis and the same appointive boards. The transition problem in such case was only one of adaptation of an identical governmental structure to four-year terms and to biennial elections in General Assembly election, *i. e.,* "odd," years. In summary, so far as important here, subsection (a) provided that city offices, *i. e.,* mayor and councilmen, filled at the general election when the referendum to adopt *Chapter* 149 is favorably voted upon, should be for an initial term of four years commencing the following January 1 if that election were one at which members of the General Assembly were chosen, and of three years if it were not such an election, even though the term of office would be for a different period if the voters did not approve the revision. It further provided that the terms of elected officials in office at the time of the adopting referendum not then up for election should be automatically extended upon the favorable referendum vote to "the January 1 following 2 years prior to the expiration of the terms of the officials elected simultaneously with the adoption of this act by any city."

Section 56 (b), providing for transition in adopting cities previously governed by forms other than *Chapter* 250, had to cover the problem of succession from an almost infinite variety of prior governmental forms where the elected officials, terms, structure, time of elections and many other pertinent factors would not only differ greatly from *Chapter* 250 cities but also between themselves. It prescribed that such a municipality should continue under its prior form until "January 1 next following the year in which the next succeeding [after the referendum adoption of *Chapter* 149] General Assembly is to be elected," with continuation in office of all

existing elected and appointed officials until that time and, presumably, with automatic termination on that date of any otherwise unexpired terms. The first election of mayor and councilmen under the *Chapter* 149 form was, in effect, directed to be held at the next General Assembly election after the referendum adoption of the chapter (which could be as long as two years after the adoption), with the mayor and one councilman from each ward then elected for four years and the other ward councilman for two years and with the party candidates therefor nominated at the primary election previously held in that year. Essentially the scheme followed the pattern of the succession provisions of the Faulkner Act. *N. J. S. A.* 40:69A–205 to 207, inc.

*Chapter* 149, which was approved by the Governor on August 30, 1963, was adopted by the voters of East Orange by referendum on November 5, 1963, which was a general election at which members of the General Assembly were elected. The offices of one councilman from each of the city's wards whose terms were expiring under *Chapter* 250 were also filled. The candidates therefor had been nominated at the primary election of that year for a two-year term under the then controlling *Chapter* 250. By virtue of the favorable referendum action and section 56(a), the winners at the general election automatically received four year terms, running from January 1, 1964 to January 1, 1968. Similarly, the mayor and the other councilman from each ward who had been elected for two year terms at the general election in November 1962, expiring January 1, 1965 and coming up for re-election at the 1964 primary and general elections if *Chapter* 250 had remained in effect, had their terms automatically extended until January 1, 1966, with the next elections for these offices to be held in 1965 for four-year terms. Consequently no election for municipal officers was held in the city in 1964.

This suit was instituted in April 1965, about a year and a half after the November 1963 referendum and after *Chapter* 149 had been in operation in the city for almost 16 months.

It had its genesis in the City Clerk's rejection of plaintiffs' petitions for the Republican nominations for ward councilmen in the 1965 primary election. They sought places on the ballot on the assumption that section 56(a) of *Chapter* 149 is invalid as a special law and that section 56(b) is therefore the transition provision applicable to East Orange. Under this thesis *Chapter* 149 would not go into effect until January 1, 1966, and thus the city was still governed under *Chapter* 250. It would follow therefrom that the ward councilmen elected in November 1963 received two year instead of four-year terms, that the section 56(a) extension of the terms of the mayor and ward councilmen elected in 1962 to January 1, 1966 was inoperative and that the latter had held office illegally since January 1, 1965. It would further follow under section 56(b) that the 1965 election would be the first one held under *Chapter* 149 and so both councilmen from each ward should be elected, one for a two year term and one for a four-year term. Pursuant thereto, the plaintiffs other than Mrs. Hardy sought to run for two-year terms and she for a four year term. Other candidates from both parties had filed petitions on the assumption that section 56(a) governed the transition and so only one councilman post in each ward was open for election in 1965, for a four-year term. Also, since plaintiffs Hardy and Loos did not meet the residence requirement for councilmen imposed by *Chapter* 149, they further urged to the Clerk that their petitions could not be rejected on that account because the requirement is unconstitutional for substantive reasons.

The complaint was filed in the Law Division the day after the last date for the filing of petitions for the June 1 primary election. Its primary object was to compel the City Clerk to place plaintiffs on the ballot in accordance with their theory of the then governmental situation in East Orange. To establish that theory, they also sought a declaratory judgment, first, determining that section 56(a) is invalid as an unconstitutional special law and that the transition in East Orange from *Chapter* 250 to *Chapter* 149 is therefore governed by sec-

tion 56(b); second, determining the terms of office held by the mayor and councilmen elected in 1962 and the councilmen elected in 1963 as well as what offices for what terms were to be filled in 1965; and third, determining that the residence requirements of *Chapter* 149 are constitutionally unreasonable and invalid. Plaintiffs did not make parties either the incumbent mayor and councilmen, whose status or terms they questioned, or the other persons who were filed candidates for ward councilmen in the coming primary election, whose right to run for four-year terms under the scheme of succession prescribed by section 56(a) might later be in question if plaintiffs proved to be right in their position.

The controversy was decided in the trial court on cross-motions for summary judgment. The judge first directed that notice of the suit be given the Attorney-General, since the complaint challenged the constitutionality of a state statute, *R. R.* 4:37–2, but that official did not intervene. The court rejected the plaintiffs' position on all counts. It found section 56(a) of *Chapter* 149 to be constitutional and to constitute the transition provision applicable to East Orange. It consequently determined that the offices of mayor and ward councilmen filled in 1962 were to be filled again in 1965 by reason of the extension of term granted by section 56(a) and that the councilmen elected in 1963 received four-year terms. It also held that the residence requirements of *Chapter* 149 were valid and that plaintiffs Hardy and Loos were thereby ineligible to run for office in any event. The other plaintiffs, who had sought to file for two-year terms under section 56(b), were permitted places on the ballot as candidates for the four-year terms which were the only ones open under section 56(a).

Plaintiffs then petitioned this court before the primary election date for certification to the trial court, *R. R.* 1:10–3, which we denied. 45 *N. J.* 35 (1965). Plaintiff Hardy alone thereafter appealed to the Appellate Division. Since the primary had then been held, the aspect of the case relating to a place on the ballot had become moot and her appeal there, as

here, concerned only the declaratory relief features, she now occupying the role of a citizen plaintiff. The Appellate Division affirmed in an unreported opinion "substantially for the reasons set forth" by the trial court. Her further appeal is here as of right on the basis that the cause involves a question arising under the Constitution of this State. *R. R.* 1 :2–1 (a).

The contentions she makes to us in several respects go beyond those alleged in the complaint or presented in the trial court. In addition, by the time the cause was argued before us, the terms of the mayor and ward councilmen elected in 1962, which had been extended by section 56(a), had expired on January 1, 1966 and the posts had been filled for four-year terms at the general election in November 1965. Nonetheless, we will consider all the points raised, none of which we feel are meritorious, in order that no cloud may remain on the validity of the government of East Orange at this date or indeed at any time since January 1, 1964.

■ Plaintiff suggests that the 1963 referendum was a nullity because the question and explanation thereof as stated on the ballot were misleading in not adequately informing the electorate, due in part to insufficient pre-election information, that the proposed form of government would not only provide longer terms for officials but would also extend the terms of the mayor and councilmen then in office. Such an objection first made 18 months after the election comes far too late. As was said in *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199 (1960) :

"The time to protest is before the election, and not, as here, after the event. Elections are solemn events of tremendous public significance. We recently reiterated that in the absence of malconduct or fraud a concluded election will not be voided for an irregularity in the ballot unless it can be said that in all human likelihood it interfered with the full and free expression of the popular will and thus influenced the result. *In the Matter of the Alleged Error in the Preparation of the Ballot for the Recall Election in the City of Hackensack,* 31 *N. J.* 592, 158 *A.* 2d 505 (1960)." (at *p.* 233)

While this issue was not set forth in the complaint and so not tried out, enough facts were presented when it was suggested

to the trial judge to show that the test just quoted could not conceivably have been met had the attack been made immediately after the event and indeed that a change in the ballot wording would not have been ordered even if the challenge had come before the election. An official explanatory brochure, widely circulated in advance, adequately informed the voters.

Many of plaintiff's other contentions are also open to the objection that they are made much too late, but we prefer to deal with them on their merits. Her next point is a suggestion that the whole of *Chapter* 149 is invalid as a local law regulating the internal affairs of East Orange. This is contrary to her position below that only section 56(a) of the statute is unconstitutional on this ground. We take the argument to be that since East Orange was asserted to be the only city governed by *Chapter* 250 in 1963, that statute, though originally a general law, had become a special charter for that city alone so that *Chapter* 149, being a supplement thereto, also amounted to inhibited local legislation. This contention of course overlooks the fact that *Chapter* 250 is still available to any city choosing to adopt it and that *Chapter* 149 is also a general law open for adoption by any municipality, whether or not primarily governed by *Chapter* 250. Without regard to this fact and even assuming that East Orange is the only city which ever adopted the latter statute, *Chapters* 250 and 149 are not thereby converted into special laws. Under the thoroughly accepted premise that a statute which actually regulates the internal affairs of a municipality is not invalid so long as it is truly general, the law is long settled that a statute relating to local government, general in form and otherwise valid in that respect, does not become special simply because it requires local adoption and may factually apply to or be adopted by only one municipality. *In re Petition of Cleveland, Mayor,* 51 *N. J. L.* 319 (*Sup. Ct.* 1889), affirmed 52 *N. J. L.* 188 (*E. & A.* 1889); *Bucino v. Malone,* 12 *N. J.* 330, 340–342 (1953).

As has been indicated, plaintiff's primary contention below, reasserted here, was that at least section 56(a) of

*Chapter* 149 amounts to a constitutionally prohibited special provision and so transition by any adopting city may only proceed pursuant to section 56(b). The point is projected on the theory that, while otherwise *Chapter* 149 is a valid general statute, there is no reasonable basis under which to require a method of transition for adopting cities then governed by *Chapter* 250 different from that applicable to those functioning under some other form of government. Again stress is laid on the assertion that East Orange was the only city operating under *Chapter* 250 in 1963 and that therefore section 56(a) could apply to no other city. The inference is that section 56(a) could only be valid if it were enacted pursuant to the special legislative procedure specified in *N. J. Const., Art.* IV, § 7, *par.* 10, rather than as a section of a general act. Once more we point out that, since *Chapter* 250 is still viable, section 56(a) would apply to any city thereafter adopting *Chapter* 250 and subsequently shifting to a *Chapter* 149 form of government. While it is clear that a provision of a statute relating to local government which prescribes disparate treatment of the subject matter as between municipalities covered thereby without good reason is invalid as special legislation, a distinction is perfectly good where it is grounded in an appropriate classification. *Gangemi v. Rosengard,* 44 *N. J.* 166, 174–175 (1965).

Here, in the light of the judicial function to pass only on the validity of legislation and not its wisdom, we have no difficulty in finding a reasonable basis for different transition provisions. When a municipality adopts a new governmental form, it does so because it believes the new will be better than the old. Therefore it would naturally desire to begin operating under the new form as soon as expeditiously possible, considering the practicalities of the necessary change-over. Besides, continuity in the conduct of the public business is desirable to the greatest possible extent consistent with the nature and extent of the change. Here a city functioning under *Chapter* 250 already had the identical governmental structure which *Chapter* 149 called for and the only

practical succession problem was the relatively simple one of making an accommodation to the longer terms of office of the mayor and governing body and to their election in "odd" years. This situation is vastly different from that which would confront municipalities with diverse prior forms of government adopting the *Chapter* 149 structure for the first time. So the distinction in transition treatment is, in our opinion, amply justified. Moreover, we see no legal support for plaintiff's contention that, even if the transition distinction is warranted, section 56(a) to be valid must also encompass transition by cities adopting *Chapter* 149 which previously operated under a governmental form something like, but not identical with, that specified by *Chapter* 250. We may say that, while at first blush, it might seem peculiar for the length of the terms of office of officials chosen at an election to depend upon the outcome of a vote on a change in government held at the same election, it is at least interesting to note that a similar technique was provided for and followed with respect to the terms of members of the Senate and General Assembly elected on the occasion of the referendum adopting our present Constitution at the general election of 1947. See *L.* 1947, *c.* 8, §24–28, inc.; *N. J. Const.* 1947, *Art.* XI, §II, *pars.* 2 and 3.

Plaintiff also urges that the extension of the terms of incumbent officials by section 56(a) is invalid, quite apart from the special law objection, because it is beyond the power of the Legislature so to interfere with municipal government. The short answer is that, while *N. J. Const.* 1947, *Art.* IV, § VII, *par.* 9(5) for the first time in the State's history specifically forbids the passage of private, local, or special laws "* * * increasing * * * the * * * term * * * of any public officers or employees," *par.* 9 went on to authorize the Legislature to pass general laws so doing. We have already found section 56(a) to be a general law. Moreover, even before 1947, legislative extension of the term of incumbent municipal officials by general law had been upheld as consti-

tutional. See *e. g., Stevenson v. Mayor of City of Bridgeton,* 123 *N. J. L.* 219 (*E. & A.* 1939).

■ Mention may also be made of plaintiff's contentions, advanced for the first time in this court, that the 1963 referendum and *Chapter* 149 "are invalid as violative of the equal protection clause of the federal constitution." The point sought to be made is not clearly articulated, but, no matter what course of supportive reasoning is intended to be advanced, we can conceive of no possible merit to it.

■ Plaintiff's final point is that the pre-election period of municipal residence required for councilmanic candidates by *Chapter* 149 is unlawful because unreasonably restrictive of the right to run for public office and of a citizen's right of choice for whom to vote. Plaintiff's nine-line point in her brief in essence says only that she relies on *Gangemi v. Rosengard, supra* (44 *N. J.* 166). In that case, the attack was on a statutory provision limiting eligibility for elective offices in first class cities governed by a Faulkner Act plan to those who had been for at least two years before the election not only residents of the city but also registered voters therein. The attacker was factually barred from seeking office only by the registration requirement. The provision in question was found unconstitutional as a special law. Only two members of the court joined in that portion of the opinion also finding the prerequisite of prior registration to be invalid. The legality of the residence requirement was not in issue. *Gangemi* pointed out that *Stothers v. Martini,* 6 *N. J.* 560 (1951) had sustained the validity of such a provision.

The judgment of the Appellate Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.