112 N.J. Super. 89 (1970)
270 A.2d 418
MEADOWLANDS REGIONAL DEVELOPMENT AGENCY, ET ALS., PLAINTIFFS,
v.
STATE OF NEW JERSEY, ET ALS., DEFENDANTS. GUY G. GALIARDO, ET ALS., PLAINTIFFS,
v.
HACKENSACK DEVELOPMENT COMMISSION, ET ALS., DEFENDANTS. IN THE MATTER OF THE APPLICATION OF THE MEADOWLAND REGIONAL DEVELOPMENT AGENCY, ET ALS., LOUIS MONTENEGRO AND PHILLIP MELLILLO, JR., ET ALS., AND TOWN OF SECAUCUS, ET ALS. CHEVAL BROS., PLAINTIFF,
v.
STATE OF NEW JERSEY, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 19, 1970.
*95 Mr. Alfred A. Porro, Jr., Mr. Ralph W. Chandless, Mr. Lewis M. Holland, attorneys for plaintiffs.
Mr. William J. Brennan, III, attorney for defendants.
TRAUTWEIN, J.S.C.
This case concerns the trial of consolidated causes of action seeking to invalidate the Hackensack Meadowlands Reclamation and Development Act, L. 1968, C. 404, hereinafter "the act," on constitutional and other grounds. The matters consolidated are:
1. Meadowlands Regional Development Agency, et als. v. State of New Jersey, et als. (Superior Court of New Jersey, Chancery Division  Bergen County, Docket No. C-1620-68)
2. Guy G. Galiardo, et als. v. Hackensack Development Commission, et als. (Superior Court of New Jersey. Chancery Division  Bergen County, Docket No. C-1620-68)
3. In the Matter of the Application of the Meadowland Regional Development Agency, et als., Louis Montenegro and Phillip Mellillo, Jr., et als. and Town of Secaucus, et als. (Superior Court of New Jersey, Appellate Division, Docket No. A-771-68, 979-68 and 791-68 (Consol.))
4. Counts 3 and 4, mounting constitutional attacks upon the act, of seven causes of action in lieu of prerogative writs (mandamus seeking to otherwise compel riparian grants filed in the Superior Court, Law Division (two in Hudson County, five in Bergen) consolidated under the caption 
Cheval Bros. v. State of New Jersey, et als. (Superior Court of New Jersey, Law Division  Bergen County. Docket No. L-28712-68 P.W.)
The proceeding brought originally in the Appellate Division under N.J.S.A. 1:7-4 seeking to void the act on the narrow ground that the legislation was a special or local law lacking compliance with the procedural requirements of N.J. Const. (1947), Art. IV, § VII, par. 8, and N.J.S.A. 1:6-1 et seq. has been held in abeyance after oral argument on cross-motions. The Appellate Division found in an unreported per curiam opinion that while defendants *96 admissions obviated the need for taking proofs on the mechanics of enactment, i.e., the procedural conditions precedent to the passage of special or local law, with defendant contending that the act was general and plaintiff alleging that it was special, observed that evidence expected to be introduced in the remaining actions pending in the Chancery Division would be of help in their determining whether the act was general or special. It therefore withheld further action until the Chancery Division actions attacking the act on other grounds were decided by the trial court. However, it granted permission to the parties to introduce evidence bearing upon the issues over which it had original jurisdiction for transmittal to it, even though not needed for the determination of issues within the jurisdiction of the Chancery Division. In such event, however, the Chancery Division was directed not to make findings of fact upon the issues exclusively within the Appellate Division jurisdiction under N.J.S.A. 1:7-4, except as such findings were a necessary incident to the resolution of other issues within the trial court's jurisdiction. Lastly, the Chancery Division was given control over the reception of evidence to be transmitted to the Appellate Division, its competency, quality and quantity, to the same extent as if the issues to be decided by the Appellate Division were within the jurisdiction of the Chancery Division.

I
L. 1968, C. 404, is a general statute. As will be demonstrated hereinafter this conclusion of law is a necessary incident to the resolution of several issues raised in the proceedings within the original jurisdiction of the trial court. Thus it has been necessary to make findings from proofs submitted, even though these very proofs are to be transmitted to the Appellate Division for independent findings and conclusions related to issues within its original jurisdiction, i.e., is the act special or general, as such finding *97 relates to N.J.S.A. 1:7-4? Defendant has conceded that it has not conformed to the requirements of N.J.S.A. 1:6-1 et seq., which outlines the procedures peculiar to the passage of special or local legislation. Thus, if the Appellate Division finds, from the proofs transmitted, that the act is special or local, it must fall despite any findings or conclusions the trial court makes upholding its vaildity. If the Appellate Division concludes that the act is general, then the interdiction of R.S. 1:6-1 et seq. has no application.
Plaintiffs contended during the trial that the act was a special or local law, irregularly passed without public notice of the intention to apply therefor and without the general object thereof expressed as required by N.J. Const. (1947), Art. IV, § VII, par. 8, and that the act was further invalid because it was not enacted in response to a petition from the local governments subject thereto, as provided in Art. IV, § VII, par. 10 of the Constitution and coordinate statutes.[1]
In order to place the issue of general versus special or local law in proper perspective, a brief summary of the act's provisions is necessary. Art. 1 declares that there are approximately 21,000 acres of salt water swamps, meadows and marshes, commonly known as meadowlands, in the lower Hackensack River basin, and lists among the objectives of the act: the orderly, comprehensive development of the Hackensack Meadowlands in order to provide more space for industrial, commercial, residential, public, recreational *98 and other uses; the development of the state-owned lands as an asset for the support of the free public school system; the fulfillment of the obligation of the State to assert its interest, and the provision of special protection from air and water pollution and special provision for solid waste disposal and the preservation of the delicate balance of nature. Art. 2 defines the boundaries of the district. It encompasses some 18,000 acres in 14 communities lying in Hudson and Bergen Counties. Art. 3 establishes the Hackensack Meadowlands Development Commission as a public corporate body with succession and sets forth the broad ambit of its powers toward the attainment of the objectives set forth in Art. 1. Art. 4 establishes the Hackensack Meadowlands Municipal Committee, consisting of the chief executive of each constituent municipality within the district or his alternate. The Committee is empowered to review, prior to final action, all codes and standards, master plans, or amendments, development and redevelopment or improvement plans or other major decisions of the Hackensack Meadowlands Commission. Should the Committee formally reject the matters submitted by the Commission, the Commission may not take any final action on the matter except by a five-sevenths vote of its full membership. Art. 5 requires the Commission to develop, adopt and promulgate a master plan for the physical development of all lands lying within the district. It includes comprehensive provisions relating to the development of the district. Among them are provisions dealing with land use, sewerage, utilities, water transportation and residential standards. Others include clearance, redevelopment and like matters, schools, libraries, parks, playgrounds and other public facilities. Additionally, the plan may provide for the distribution and density of population, the appearance of the community within the district, water pollution, waste disposal and other matters related to the planned development of a model community. To implement the Commission's broad planning powers, Art. 5 further provides that no *99 constituent municipality shall take any action respecting land use or building construction within the district which is inconsistent with the master plan's provisions. Moreover, the Commission must review and approve any municipal project within the district which contemplates the use of public funds. The Commission is also empowered to review and regulate all subdivisions, site plans, buildings and other uses within the district, to insure that they conform with its master plan. Furthermore, the Commission is empowered to act as a regional redevelopment agency under the Redevelopment Agencies Law, L. 1945, C. 306 (N.J.S.A. 40:55C-1 et seq.), thus rendering it eligible to receive federal renewal grants.
Art. 6 empowers the Commission to issue bonds and notes. Art. 7 authorizes it to condemn land within or without the district when necessary, notwithstanding that the land in question may already be in the hands or under the control of a municipality or other public agency. However, § 37 of the act provides for payments to municipalities in lieu of taxes. Art. 8 provides for special assessments against real estate located in improved districts which the Commission is empowered to establish. Assessments against public lands can be paid from State funds. Art. 9 contains the inter-municipal tax-sharing feature by which the constituent municipalities share the tax benefits and burdens resulting from the Commission's development and redevelopment activities.
Art. 10 contains the act's general provisions. Among them is one empowering any public body to cooperate with the Commission. Additionally, the article provides that the Commission may enter into contracts with one or more municipalities, counties or other public agencies for the operation of public works and improvements. The remainder of the act establishes the procedure for the determination of title to the meadowlands, both within and without the district, by amending and supplementing the Department of Conservation and Economic Development Act of 1948 *100 (L. 1948, c. 448) It directs the Resource Development Council to undertake title studies and surveys of the meadowlands to determine which are state-owned and establishes a Hackensack Meadowlands Negotiations Board to set fair prices for leases or conveyances of state-owned land where such leases or conveyances are found to be in the public interest.
Plaintiffs contend that the act, by definition, is private, special or local because its application is restricted to some 18,000 acres in Hudson and Bergen Counties affecting some 14 constituent communities. They reason that this constitutes a designation and not a classification, thus rendering the act invalid on its face.
[Based on expert testimony developed in the case, the court found that the areas excluded from the district represented a reasonable and proper exercise of legislative judgment. The court concluded:]
The Hackensack meadowlands in the 14 constituent municipalities thereof are distinguished by characteristics sufficiently marked in importance to constitute them a separate class among other areas and municipalities in New Jersey. None of the Legislature's exclusions of other areas and municipalities from the regulated class is arbitrary. Each is supported by the application of recognized planning principles thereto.
Our Courts have dealt with other legislation regulating specific areas of the State. The decisions in State v. Corson, 67 N.J.L. 178 (Sup. Ct. 1901); Van Cleve v. Passaic Valley Sewerage Com'rs, 71 N.J.L. 183 (Sup. Ct. 1904), rev'd on other grounds, 71 N.J.L. 574 (E. & A. 1905), and Sherwood v. Bergen-Hackensack Sanitary Sewer Authority, 24 N.J. Misc. 48 (Sup. Ct. 1946), aff'd 135 N.J.L. 304, 309 (E. & A. 1947), all address themselves to legislation which regulated specific areas of the State. See also cases cited in In re Freygang, 46 N.J. Super. 14, at 24 (App. Div. 1957), aff'd 25 N.J. 357 (1957). In all these cases *101 the court wrestled with the issue which the act presents herein: is the legislation a legitimate product of the Legislature's power to classify, in that the regulated class is distinguished by characteristics sufficiently marked and important to make it a class by itself, and, related thereto, does it arbitrarily exclude subjects the characteristics of which warrant their inclusion within the class? Roe v. Kervick, 42 N.J. 191, 233 (1964).
Thus, the issue in this aspect of the case is reasonable classification viewed against the purpose which the act exists to serve. Bayonne v. Palmer, 90 N.J. Super. 245, 284 (Ch. Div. 1966), aff'd 47 N.J. 520 (1966). A threshold question is the manner in which this issue is to be resolved. Plaintiffs seem to suggest at the trial that the burden was upon the State not only to prove the reasonableness of its classification, but to establish that the meadowland district, if not divinely ordained, was at least divinely inspired. They are in error. The act is presumptively valid and the onus of establishing that it is not rests on them. Jamouneau v. Harner, 16 N.J. 500, 515 (1954); In re Freygang, supra, 46 N.J. Super. at 28. Moreover, the State does not have the burden of proving that the meadowland district is susceptible to any other dimensions than those it now has. The act must be viewed in the light of the Legislature's power to classify for purposes of regulation. The N.J. Constitution (1947) does not require mathematical perfection in its exercise of that power. Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960). Defendant's position is best expressed by the standards articulated in Wilson v. Long Branch, 27 N.J. 360, 377 (1958), which there appear in the context of equal protection of the laws but are equally applicable to Art. IV, § VII, par. 9 of our Constitution:
* * * And a classification is reasonable if it rests upon some ground of difference having a real and substantial relation to the basic object of the particular enactment or on some relevant consideration of public policy. If there is a reasonable distinction, *102 there is no oppressive discrimination. The Legislature has a wide range of discretion in this area and distinctions will be presumed to rest upon a rational basis if there be any conceivable state of facts which would afford reasonable support for them.
In brief, the Legislature is accorded a broad discretion in the area of permissible classification, Passaic v. Consolidated Police, etc., Pension Fund Comm'n, 18 N.J. 137, 146 (1955), and it is only when the purported basis for classification is illusory that the courts will condemn the product thereof, Van Riper v. Parsons, 40 N.J.L. 1, 9 (Sup. Ct. 1878).
Whether the act is a general one or not depends upon the factual basis for the Legislature's classification. Van Cleve v. Passaic Valley Sewerage Com'rs, supra, 71 N.J.L. at 201. At the trial defendant's evidence sought to establish the unique nature of the Hackensack meadowlands, defined in § 3 of the act (N.J.S.A. 13:17-3(j)) as all those meadowlands lying within the 14 constituent municipalities. If the meadowlands are unique, then so, by definition, are the municipalities which contain them.
It was established that the line on the map defining the meadowlands district was the product of a series of decisions, each based upon planning criteria, made between competing alternatives. It was not claimed that reasonable persons could not draw the boundary differently. It was recognized that the district could have other dimensions and still suit the act's purposes. Doubtless there are some areas which could arguably be included within the district, just as there are areas which arguably could be excluded.
Months before the act became law, Commissioner Ylvisaker, testifying before a legislative committee in support of the bill which became the act, recognized that there is no such thing as a line on a map that all will accept. Hearings on Senate Bill 477 before Joint Commissions on Agriculture, Conservation and Natural Resources, at 87, 88.
Mankind's bloody history provides a basis for his observation. Unlike other lines, which often are the product *103 of force or circumstances, each turn and convolution of the district line was formed by a decision based upon the application of recognized planning criteria to the observable characteristics of the terrain under consideration. No claim was made that each decision was ultimately correct and so beyond argument; it is claimed that each decision was, in the circumstances in which it was made, reasonable, and that the district line, which is the sum of these decisions, is itself reasonable, and by reasonable is meant the antonym of arbitrary, which should not be defined to mean arguable.
Before concluding on the issue of general versus local law, plaintiffs' argument that there are other regions in the State equally susceptible to regional planning and thus the Legislature should have provided for these areas as well in the act, should not be overlooked. However, the failure to include them in the act does not render the act invalid.
Plaintiffs' premise is incorrect. The Hackensack meadowlands are unique, if only for the reason that they constitute a vast reservoir of vacant lands situated in the midst of the New York-Northeastern New Jersey metropolitan area. No other area  not even the Raritan meadows  is similarly located. Population pressures on other regions of the State may some day warrant their receiving the same legislative treatment currently afforded the Hackensack meadows. This does not mean, however, that the Legislature must defer dealing with the exigent problems of the Hackensack meadowlands until such time as conditions in other regions of the State justify similar legislative treatment.
The argument that in other parts of the state there now exist similar conditions that ought to be dealt with in like manner, even if it were based on a correct statement of the fact, which it is not, should be addressed to the lawmaking power, and not to the courts. It is for the Legislature to decide whether certain territory should be subjected to sanitary and police regulations of the character now *104 under consideration. In their wisdom, they have declared that public exigencies require the creation of a sewerage district in the Passaic Valley, and its regulation by law. We cannot by judicial construction postpone their lawmaking upon the subject until the public needs require the creation of other sewerage districts sufficient to form a "class," in the sense of a group of subjects that may be legislated upon collectively. Classification is essential only for the purpose of differentiating among many individuals, in order that fewer than the whole number may be generalized for the purpose of being treated in groups. But where there is only a single individual  as here, a single established sewerage district  grouping, classification, generalization, are alike impossible.
Nor are they necessary in order to avoid conflict with the Constitution. The purpose of the prohibition against "special or local" laws is not to prevent legislation where there is but one individual to be dealt with. The purpose is to prevent unfounded discrimination where there are two or more individuals to be dealt with. [Van Cleve, supra, 71 N.J.L. at 206, 207. See also, Robson v. Rodriquez, 26 N.J. 517, 524 (1958); New Jersey Restaurant Ass'n, Inc. v. Holderman, 24 N.J. 295, 300 (1957)]

II
Plaintiffs have particularly focused their attention on the formula provided in Art. 9 of the act, commonly characterized as the inter-municipal tax-sharing account, and its alleged invalidity.
The provisions concerning the inter-municipal tax-sharing account appear in §§ 59 to 74 of the act, N.J.S.A. 13:17-60 to 76. Section 59(a) (N.J.S.A. 13:17-60) sets forth the Article's purpose, which is to insure that all constituent municipalities share equitably in new benefits and costs resulting from meadowland development.
Under the Commission's master plan powers (Art. 5 of the act, N.J.S.A. 13:17-9 to 22, and particularly N.J.S.A. 13:17-11), it will plan the district to provide for mixed uses which will include residential as well as industrial areas, open spaces, parks, schools, libraries and the like.
Obviously, some uses, such as industries, result in valuable ratables which do not bring with them a proportional *105 demand for municipal services. Others, such as parks and single-famliy residences, cause maximal demands for municipal services without providing sufficient ratables to meet the cost thereof.
Art. 9 is the legislative answer to the unfairness which would otherwise be the product of the Commission's land use power. It equitably apportions the benefits of the Commission's activities among the constituent municipalities, thus avoiding the bickering for ratables which, according to the Meyner Commission Report, at 17 (June 1965), has characterized meadowland "development" as it has occurred to date.
The concept behind the inter-municipal account begins with each municipality incurring a gross obligation based upon the new aggregate true value of real property in that part of the meadowland district which lies within the municipal limits, computed with reference to the base year 1969.[2] The aggregate true value of all such real property as of October 1, 1969, is compared against the aggregate true value thereof as of October 1 of each year commencing with 1970, to determine the increase or decrease in aggregate true value which will be used in the inter-municipal account calculations for the succeeding adjustment year commencing with 1971. (§ 65(a) (1) of the act, N.J.S.A. 13:17-67).
Aggregate true value is, in all instances, computed on the basis of well-established practices. In the first instance, the municipal assessor annually values the meadowland district real property within his jurisdiction, at which time he is to determine the full and fair value thereof. Thereafter  since local assessments rarely reflect true value, but only a percentage thereof, Switz v. Kingsley, 37 N.J. 566 (1962); N.J.S.A. 54:4-2.25  true value is discerned *106 through the application of the average assessment ratio promulgated annually by the Director of the Division of Taxation for state school aid purposes to the assessor's aggregates (N.J.S.A. 18A:58-4; see also Bayonne v. Division of Tax Appeals, 49 N.J. Super. 230 (App. Div. 1958) (§ 65(a)(2) of the act, N.J.S.A. 13:17-67).
The municipality's gross as distinguished from net obligation is determined by multiplying the increase in aggregate true value of its real property for the year in question by the apportionment rate, which boils down to the average tax rate of the 14 constituent municipalities (§§ 65(a) (3) and (b); N.J.S.A. 13:17-67).
The act provides for credits against each municipality's gross obligation to the fund. There is a credit related to the cost of new municipal services, police, firemen, sanitation, schools and the like, which each municipality provides to the district (§§ 67 and 68, N.J.S.A. 13:17-69 and 70). There is another credit for the cost of those municipal projects which, in the Commission's judgment, serve also to benefit the district as a whole and are consistent with its master plan. (§ 69, N.J.S.A. 13:17-71). Each municipality is guaranteed, in effect, the value of its meadowlands tax ratables as of 1969, the base year (§ 66 of the act, N.J.S.A. 13:17-68). The surplus, if any, remaining in the inter-municipal account is distributed to the constituent municipalities on an aliquot basis related to the area of unimproved and redeveloped lands each has within the district as against the total area of such lands therein  the apportionment payment  (§ 70(a), N.J.S.A. 13:17-72).
The contribution of each municipality to the inter-municipal account, or its receipt of funds therefrom  in either case called the meadowland adjustment payment  is simply the net amount derived by subtracting the amount of the service project guarantee and apportionment payments from the gross sum due the inter-municipal account. If the payments exceed the amount due, the municipality *107 receives money from the fund. If they do not, it makes a contribution thereto (§ 72, N.J.S.A. 13:17-74).
The premise behind Art. 9 is that, as a result of the Commission's activities, partciularly in development and planning, the value of real property within the meadowland district will be enhanced far beyond what would be the case were the municipalities therein to be left to their own devices. It envisions that all municipalities will reap the benefits from this new value in the form of ratables and revenue therefrom which would otherwise be lost. The effect on the tax rate of each municipality, from these otherwise unavailable ratables, must be beneficial. Art. 9 simply exists to equitably apportion the benefits so derived.
The result of Art. 9 will be to call upon some of the constituent municipalities (the number and identity thereof will probably change from year to year) to remit a part of the new revenues they receive from new meadowland value to those municipalities in which are located the schools, parks and residences which do not provide valuable tax ratables. Plaintiffs urge this to be constitutionally objectionable.
Their attack on the inter-municipal tax-sharing account appears to rest upon several constitutional provisions. The first is that the act is a private, special or local law relating to taxation or exemption therefrom, and so treats with a subject prohibited to the Legislature by N.J. Const. (1947), Art. IV, § VII, par. 9(6), which provides: "The Legislature shall not pass any private, special or local laws: * * * (6) relating to taxation or exemption therefrom, * * *." I have found the act to be general. See I, supra. The second is that the act violates Art. IV, § I, par. 1 of the State Constitution, in that it is an improper delegation of the Legislature's taxing power and, related thereto, it delegates the taxing power to an agency, the Commission, which does not exercise the power of local self-government, and it delegates the taxing power to an area which is not coterminate with one which exercises powers of local self-government. *108 The third is that the act violates Art. VIII, § I, par. 1(a) of the Constitution.
Art. 9 and the inter-municipal account are sui generis. Research has found nothing comparable thereto, either in New Jersey or anywhere else. It does not appear that the act directly imposes a state tax on the citizens and taxpayers of those municipalities as will be, from time to time, required to make a payment into the inter-municipal account.[3] In legal contemplation, such payments are obligations related to a public purpose which the State can properly require its subordinate political subdivisions to incur. In any event, Art. 9 and its operation have an effect on municipal taxes. Nevertheless, since the act is a general law, such effect is constitutionally permissible under the express provisions of Art. IV, § VII, par. 9 of our Constitution.
A. The State is empowered to require its subordinate political subdivisions to incur expenses related to a public purpose. The payments that some of the constituent municipalities will from time to time make to the inter-municipal account are such expenses. Art. 9 of the act, which imposes such requirements, is therefor valid.
The act imposes the meadowland adjustment payment directly on the constituent municipalities, and only indirectly on the taxpayers thereof. Section 72(c) of the act (N.J.S.A. 13:17-74(c)) provides that a municipality obliged to make such a payment treat it as a line-item appropriation in its annual budget. It is handled as any *109 other cost of municipal government and will be included in the amount to be raised by taxes to support municipal government (N.J.S.A. 40A:4-30). Thus, while the taxpayers of some municipalities will ultimately bear the cost of the meadowland adjustment payment, that cost as to them is a part of the cost of municipal government which their municipal taxes pay.
It is clear that the State is empowered to impose costs and expenses on its units of local government to fulfill a public purpose, even when the municipalities subject to the State's charge must raise money by taxation to pay the obligation so imposed, Easton and Amboy R.R. Co. v. Central R.R. Co., 52 N.J.L. 267, 275-276 (Sup. Ct. 1890). See also, 2 McQuillin, Municipal Corporations, §§ 4.159, 4.162; 16 Ibid., § 44.33; 37 Am. Jur., Municipal Corporations, § 91.[4]
This conclusion rests on two well recognized principles. "Municipal corporations are merely political subdivisions of the State and the legislative control over them is almost unlimited," Becker v. Adams, 37 N.J. 337, 340 (1962); Jersey City v. Martin, 126 N.J.L. 353, 361 (E. & A. 1941), and "* * * All taxes, whether levied for state, county, or municipal purposes, are state taxes; they can be imposed by no other authority than that of the state. The state appropriates the proceeds to what purposes it sees fit; but, however the proceeds may be appropriated, every tax is a state tax." State Board of Assessors v. Central R. Co., 48 N.J.L. 146, 280 (E. & A. 1886). See also, Ridgefield Park v. Bergen County Board of Taxation, 61 *110 N.J. Super. 170, 181 (Law Div. 1960), rev'd on other grounds 33 N.J. 262 (1960), app. dism. 365 U.S. 648, 81 S.Ct. 834, 5 L.Ed.2d 857 (1961).
In New Jersey two conditions limit the power of the Legislature to impose an expense on its political subdivisions  the expense must be for a public purpose[5] and the statute which imposes it must be general and not special, private or local.[6]
Some constitutions expressly prohibit the Legislature from compelling municipalities to incur debts. See, e.g. McKinney's Consolidated Laws of New York, Constitution, Art. 8, § 4. However, even in the face of such an express proscription, courts have held that the Legislature can impose an obligation upon a municipality in its capacity of an agent of the State carrying out governmental and public, as distinguished from municipal, functions. See Chicago, M. & St. P.R. Co. v. Lake County, 287 Ill. 337, 122 N.E. 526 (Sup. Ct. 1919).
The act clearly meets both conditions. While the benefits thereof and the Commission's activities will primarily benefit the meadowland communities through increased revenues *111 derived from new ratables on presently unusable land, the fact remains that the act serves a broad public purpose apart therefrom (§ 1, N.J.S.A. 13:17-1).
And, while Art. 9 clearly relates to the matter of taxation within the 14 constituent municipalities, it is a general law. The incidental effects it has on municipal taxation, just as with the incidental effect it has on other matters of municipal concern, are constitutionally permissible. Jamesburg v. Hubbs, 6 N.J. 578, 584, (1951); Lynch v. Edgewater, 8 N.J. 279, 292 (1951); Hardy v. Ruhnke, 47 N.J. 10, 21 and Van Cleve v. Passaic Valley Sewerage Comm'rs, supra, 71 N.J.L. at 198, 199.
These conclusions are tested against the decision of the Court of Errors and Appeals in Jersey City v. Zink, 133 N.J.L. 437 (E. & A. 1945), in which the court held that a series of statutes, the operation of which bore a superficial resemblance to Art. 9, were constitutionally invalid as private, local or special laws regulating the internal affairs of 14 plaintiff municipalities in which Class II railroad property was located. N.J. Const. (1844), Art. IV, § VII, par. 11, now N.J. Const. (1947) Art. IV, § VII, par. 9(13).
The statutes under attack in Zink combined to provide that part of the interest of Class II railroad property taxes was to go into the State Treasury and to appropriate the funds so placed for general school purposes in municipalities throughout the State. Prior to the enactment of the statutes it appears that the practice was to pay all such interest to plaintiff municipalities.
The court first found that the funds representing the interest on the past-due taxes were the property of the 14 municipalities and that the statutes served to divest them thereof and to place the funds in the State Treasury for the use of other municipalities. The court then held that the effect of the statutes was arbitrarily to divide New Jersey's municipalities into two classes: the 14 entitled to receive the interest on Class II railroad property taxes and *112 the remaining 553 municipalities which were the beneficiaries of the formers' enforced largess.
The acts in question plainly violate Article IV, Sec. VII, par. 11, of the Constitution, N.J.S.A. in that they are special and discriminatory and arbitrarily create a classification of 14 contributing municipalities and 553 beneficiary municipalities.
Under this provision of the Constitution, the State may not arbitrarily take funds from one municipality and allot them to another, nor arbitrarily require a group of municipalities to contribute from their tax revenues to the support of the state government and absolve others from the same obligation, especially where the diverted funds are derived from assessments levied upon local properties. * * *.
The distribution of the burden cannot be arbitrary or unreasonable [at 447, emphasis supplied]
The court's holding in Zink and the applicability of its decision to the case at bar rest upon its finding that the effect and purpose of the statutes was arbitrarily to classify New Jersey's municipalities into burdened and benefited classes.
They [acts] create preferences and inequalities within a class and do not operate equally on all members of the class. * * * They do not incidentally produce a local or special result but were illusorily conceived with a purpose and idea that their inherent force and scope would produce a local and not a general result * * *. [at 448].
Zink seems to hold that the fatal weakness of the statutes was that the burden they imposed upon the 14 municipalities was the sole basis for the resultant classification of New Jersey's municipalities and, indeed, the sole purpose behind the statutes. Besides the fact that the burdened municipalities contained Class II railroad property and those benefited did not, there were no other factors to distinguish between the two classes. The burden was not only not an incidental result of an otherwise legitimate legislative classification; without it there would be no classification at all.
*113 The present act stands in stark contrast with the statutes considered in Zink. While it too singles out 14 municipalities for distinctive legislative treatment, the factors upon which the legislative classification is based are not only substantial but exist independently of the fact that, among the 14 municipalities so classified, from year to year some of them will contribute a part of the excess tax revenues received as a result of meadowland development to those municipalities in which, pursuant to the Commission's planning powers, parks, residences, schools and the like are located.
The act is a general law. While it obviously relates to the tax rate of each constituent municipality, it is equally and obviously an incidental effect visited on the municipalities by operation thereof and in furtherance of the act's purposes. The tax-sharing which Art. 9 brings about is not, unlike the statutes considered in Zink, the sole purpose behind the act and its reason for being. Rather, and as § 59(a) of the act (N.J.S.A. 13:17-60) vividly sets forth, the inter-municipal account is merely a component, albeit a vital one, of the legislative plan to develop the Hackensack meadowlands.
Nor do I find in the act the arbitrary allotment of tax revenues from one municipality to another which Zink condemned. No decision which research discloses prohibits the allotment of tax revenues from one municipality to another. Indeed, given the State's sovereignty over its municipal subdivisions, and the principle that all taxes are imposed under ultimate legislative authority, see State Board of Assessors v. Central R. Co., supra, 48 N.J.L. 146, the failure to find such a decision is not surprising. Thus, the issue is not whether the Legislature has the power to apportion tax revenues, but whether in particular circumstances the exercise of its power is arbitrary.
In Zink the Court of Errors and Appeals found the Legislature's exercise of its power to be arbitrary. In Newark v. Public Service Coord. Transport, 9 N.J. Misc. 772 (Sup. *114 Ct. 1931), aff'd 109 N.J.L. 270 (E. & A. 1932), the court upheld a statute which required the City of Newark to pay for the public transportation of police officers, including those from other municipalities. Newark claimed that the statute violated Art. IV, § VII, par. 12 of our 1844 Constitution. Its theory proceeded on the basis that the effect thereof was to levy upon it an arbitrary and undefined contribution for the benefit of other municipalities.
The statute there under attack provided that owners of street cars and buses could deduct the cost of free transportation they were required to provide to police officers from their municipal taxes. Newark argued that since police officers from other municipalities could ride free on buses and street cars operated by Public Service, a Newark taxpayer, its tax receipts therefrom were decreased by an amount equal to the cost of providing free transportation to police officers from other municipalities. The result, in Newark's contemplation, was the arbitrary diversion of its tax revenues for the benefit of other municipalities. The court rejected Newark's challenge. It held that Newark stood to benefit from the transportation of police officers riding on trolleys and buses within its municipal limits, notwithstanding that some of the police officers in question may have been from other municipalities. This fact served to relieve the statute of any arbitrary effect as to Newark, since its citizens received a benefit along with the cost.
The same principle operates with respect to those municipalities required to make contributions to the inter-municipal account. The account is essential to the successful development of the Hackensack meadowlands (§ 59(a) of the act, supra). The act will benefit all of the constituent municipalities through the development of lands which thus far have lain idle. The cost of any municipality's contribution to the inter-municipal account is directly related to new value in its meadowlands. By definition, such cost cannot be an arbitrary exaction for the benefit of other *115 municipalities since, as in Newark's case, it is directly related to a benefit which the contributing municipality itself receives.
In summary, the act is a general law. It imposes a cost upon some of the constituent municipalities which must be met by taxation. The State is empowered to impose such a cost so long as the act which imposes it is general. Moreover, the fact that part of the revenues of municipality X are payable to municipality Y is of no constitutional significance, given the relationship between the State and its political subdivisions, so long as the allotments between one and another are reasonable, as they are here, and not arbitrary. It is therefore valid under N.J. Const. (1947), Art. IV, § VII, par. 9(6).
B. The act does not violate Art. IV, § I, par. 1 of the Constitution as an improper delegation of the legislative power to tax, since nowhere in the act did the Legislature delegate its taxing power. Art. IV, § I, par. 1 provides: "The legislative power shall be vested in a Senate and General Assembly."
Plaintiffs' reliance on the holdings in Van Cleve v. Passaic Valley Sewerage Comm'rs, 71 N.J.L. 574 (E. & A. 1905), and Bernards Tp. v. Allen, 61 N.J.L. 228 (E. & A. 1897), rests in misconception. Both cases involve statutes giving appointed officials practically unlimited discretion to determine the amounts which municipalities subject to their jurisdiction were required to raise by taxation. The court held that the statutes were tantamount to an unlawful delegation of the taxing power, which could only be made to political subdivisions for the purpose of raising revenues to meet the cost of local government.
Unlike the statutes considered in Van Cleve and Bernards, the Legislature has not conferred upon the Commission unlimited discretion to determine the amount of the meadowland adjustment payment each contributing municipality is to make. The Commission's function in this regard is largely one of doing the arithmetic based upon an *116 explicit legislative formula. The Legislature, through its formula, determines the amount of that part of the cost of local government related to the meadowland adjustment payment which each contributing municipality must raise by taxation. The Commission's function is purely ministerial in computing the amounts due.[7] As the decisions upon which the plaintiffs rely quite clearly hold, the Legislature may properly delegate incidents of the taxing power, such as the functions of computation, appraisal and adjustment, to appointive officials without running afoul of the proscription against delegation of the power itself thereto, Bernards, supra, 61 N.J.L. at 238, Van Cleve, supra, 71 N.J.L. at 581; see also Switz v. Kingsley, 69 N.J. Super. 27, 34 (Law Div. 1961), aff'd as modified, 37 N.J. 566 (1962).
*117 C. The act does not violate Art. VIII, § I, par. 1(a), of the State Constitution, which provides that
Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value; and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
The first sentence is identical to the first two clauses in its counterpart in the 1844 Constitution Art. IV, § VII, par. 12, which provided that:
Property shall be assessed for taxation under general laws, and by uniform rules, according to its true value.
The difference between the 1844 and 1947 taxation provision are twofold. The first is found in the substitution of the new "according to the same standard of value" assessment *118 provision for the previous and more troublesome "according to its true value." See 1 Proceedings, Constitutional Convention of 1947, at 768, 769. See also Switz v. Kingsley, supra, 37 N.J. at 572. The second is found in a new clause which did not have a counterpart in the 1844 Constitution and which reads in relevant part:
* * * and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
The history for this clause relates to the tax treatment of Class II railroad property, which is all real property used for railroad purposes exclusive of the main stem. Under a series of statutes dating from 1844 (L. 1884, C. 101) the Legislature provided that municipalities in which Class II railroad property was located would receive the tax revenue therefrom. The earlier acts (L. 1884, c. 101, and L. 1905, c. 91) provided for state valuation of Class II property against which the municipal tax rate would be applied. Thereafter, the State would collect the tax for the use of the municipality. The railroads objected to these statutes on grounds that treating their real property differently from other municipal ratables for purposes of valuation and collection offended Art. IV, § VII, par. 12 of the 1844 Constitution. The Court of Errors and Appeals upheld the statutes, holding that property used for railroad purposes was a proper class for the valuation of property for taxation and the collection of the resulting tax. State Board of Asesssors v. Central R. Co., 48 N.J.L. 146 (E. & A. 1886); Bergen and Dundee R. Co. v. State Board of Assessors, 74 N.J.L. 742 (E. & A. 1907).
L. 1941, c. 291 provided not only for the assessment of Class II railroad property and the collection of taxes thereon. It also levied a tax of $3 per $100 of assessed value on such property, which was a lower tax rate than that prevailing in many if not all municipalities in which Class II property *119 was located. This time the municipalities attacked the Legislature's power to classify for tax purposes. They argued that Art. IV, § VII, par. 12 of the 1844 Constitution required equality in the assumption of the local tax burden and that all ratables within the taxing district should contribute pro rata to the cost of municipal government. In Jersey City v. State Board of Tax Appeals, 133 N.J.L. 202 (Sup. Ct. 1945), modified in other respects sub. nom. Jersey City v. Kelly, 134 N.J.L. 239 (E. & A. 1946), the Supreme Court held that just as the Legislature could, under the thrust of the earlier decisions cited herein, classify real property for the purposes of assessment and collection, so also could it classify to determine the relative share of the tax burden each class would carry.
This view of Art. IV, § VII, par. 12, prompted the League of Municipalities, through Milton B. Conford (now Appellate Division judge, to urge the delegates to the 1947 Constitutional Convention to adopt a tax clause which would prohibit preferential treatment for Class II railroad property and which would overturn the decision in Jersey City v. State Board of Tax Appeals, supra. See 5 Proceedings, Constitutional Convention of 1947, at 563-576.
The new clause accomplished the purpose which the League of Municipalities envisioned. Class II railroad property was required to be taxed at the same rate as other ratables within the tax district.[8] Moreover, to the extent that the clause was directed to the Supreme Court's decision *120 in Jersey City v. State Board of Tax Appeals, supra, we may fairly conclude that it took from the Legislature the power it had under the 1844 Constitution to classify real property in terms of the relative share of the burden of local government each class within a tax district would bear. Unlike the 1844 Constitution which, according to the cited decision, permitted the Legislature to confer preferential status on a class or classes of real property, the 1947 Constitution requires equality in the distribution of the burden of local government upon taxable real property situate therein, Switz v. Kingsley, 37 N.J. 566, 572 (1962); Siegal v. Newark, 38 N.J. 57, 60 (1962); New York, Susquehanna and Western R.R. Co. v. Vermeulen, 44 N.J. 491, 499 (1965).
Art. 9, when viewed against the language and history of Art. VIII, § I, par. 1(a), demonstrates that it is entirely consistent therewith. The burden of the cost of local government falls equally upon the taxpayers of each municipality  precisely the goal which the constitutional article was designed to achieve. The only manner in which the constituent municipalities are distinguished from others in tax matters lies in the fact that new tax revenues related to meadowland development are apportioned equitably among them. This is the extent of the Legislature's "classification," since the act does not provide for preferential treatment of any class of real property within any of the constituent municipalities.
The Court of Errors and Appeals held, in Jersey City v. Martin, supra, 126 N.J.L. at 359, that the apportionment of taxes collected is an incident of the collection function, and that the principles governing the levying of taxes have no relation to their distribution by the State, citing Bernards Tp. v. Allen, supra.
This is consistent with the holding in Trustees for Support of Public Schools v. Trenton, 30 N.J. Eq. 667 (Ch. 1879) which held:
*121 Every system of taxation consists of two parts: the one relating to the assessment (the designation of the persons and things which shall be the subject of taxation) and the apportionment of taxation among such persons and things in the ratio prescribed by law; the other, the collection of the taxes assessed, by the enforced payment thereof. Incident to both these departments of taxation, is the machinery by which the assessment shall be made, and its collection enforced. [at 677]
The "mere machinery" of assessment and collection "is left to legislative discretion." Kirkpatrick v. New Brunswick, 40 N.J. Eq. 46, 52 (Ch. 1885), aff'd sub. nom. Taxpayers' Protective Ass'n v. Kirkpatrick, 41 N.J. Eq. 347 (E. & A. 1886).
Thus, to the extent that the Legislature has classified the real property in the constituent municipalities for tax purposes  which it really has not  the classification only relates to apportionment of tax funds, an incident of the collection function, with respect to which the Legislature retained its power of classification after the 1947 Constitution was adopted. New York, Susquehanna and Western R.R. Co. v. Vermeulen, supra, 44 N.J. at 499.
In sum, it still appears that Art. 9 of the act under attack is sui generis and that the only constitutional tax provision impinging upon it is Art. IV, § VII, par. 9(6). This part simply serves to focus the major question concerning the act: is it special or general? I have found it to be general. Thus there is no paragraph 9(6) problem. I do not perceive any improper delegation of legislative authority under Art. IV § I, par. 1, nor any effect which Art. VIII of our Constitution has upon the act. It serves to insure that no class of property escapes bearing its equal share of the local tax burden. While Art. 9 of the act may affect the relative dimensions of each municipality's total tax burden, there is a matter for Art. IV, § VII, par. 9(6). The act has no effect whatever upon the manner in which the burden is carried within the taxing district. It is assumed that each municipality assesses, levies and collects taxes consistently *122 with Art. VIII of the State Constitution. If it does not, the wrongs resulting therefrom are to be laid at its door, and not the act's.

III
The act does not violate Art. IV, § VII, par. 9(12) and (13) of the Constitution wherein the Legislature is prohibited from passing "any private, special or local laws * * * (12) appointing local officers or commissions to regulate municipal affairs. (13) Regulating the internal affairs of municipalities formed for local government and counties, except as otherwise in this Constitution provided * * *". (Emphasis supplied).
The act has been held to be a general law. See I. The last paragraph in Art. IV, § VII, par. 9, provides that the Legislature can pass general laws providing for the cases denied validity as private, special or local laws.

IV
The act does not violate N.J. Const. (1947), Art. IV, § VI, par. 2, which provides that
The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature.
It is obvious from the language of this provision itself that it merely permits the Legislature to delegate to municipalities such part of its police powers as relate to zoning and land use control. N.J.S.A. 40:55-30; Roselle v. Wright, 21 N.J. 400, 408, 409 (1956).
Plaintiffs apparently urge that delegation is equivalent to abdication and that the Legislature is powerless to provide *123 for the Commission's land use powers contained in Art. 5 of the act (N.J.S.A. 13:17-9 to 22).
Municipalities, like other political subdivisions, are creatures of the State. They are not independent principalities. Art. 5 of the act concededly serves to limit the power of the 14 meadowlands municipalities to regulate land uses within the meadowlands district. In legal effect, this translates over to a legislative abridgment of a previously conferred power upon a subordinate political unit, a matter which is well within the sovereign's authority.
This principle is well illustrated in N.J. Interstate Bridge and Tunnel Comm. v. Jersey City, 93 N.J. Eq. 550 (Ch. 1922). The Legislature there provided for the construction of the Holland Tunnel. As work prepared to commence, Jersey City police officers appeared on the scene and prohibited any construction until the contractor obtained a permit conforming with Jersey City's building code.
The court enjoined Jersey City from interfering with the conduct of the State's project. It observed that the city's powers under its building code were subject to repeal by the State, which granted the powers in the first place. It then held that the act providing for the construction of the Holland Tunnel overrode the provisions of Jersey City's building code and nullified it to the extent it required the State to comply therewith.
Municipalities are the creatures of the state and the powers given to them are always subject to be abridged or repealed by the sovereign who conferred them. See Eastern Tel. [& Tel.] Co. v. Public Utility Board, 85 N.J.L. 511, 89 A. 924 (Sup. Ct. 1914). The building code of Jersey City was of course enacted subject to the power of the state to modify or annul it at any time. And the state, in the act creating the bridge and tunnel commission and clothing it with power to provide for interstate bridges or tunnels, with all the powers appropriate and necessary for the proper performance of such duties, without any limitation as to municipal control, overrode that code to the extent of nullifying its provisions so far as they required compliance with them by the state. [at 553]
*124 See also, Union County v. Benesch, 98 N.J. Super. 167, 179 (Law Div. 1967); Bloomfield v. N.J. Highway Authority, 18 N.J. 237, 241 (1955).
The act, and particularly Art. 5 thereof, serves partially to withdraw the Legislature's earlier grant to the 14 municipalities of its power to regulate the use of land. This is implicit in the act and explicit in the result. It is also permissible under our State Constitution.

V
The act does not violate N.J. Const. (1947), Art. IV, § VII, par. 3, which prohibits the enactment of ex post facto laws or laws impairing the obligation of contracts.
Section 103 of the act states its effective date to be July 1, 1968. The act was signed into law on January 13, 1969. Plaintiffs theorize that the enactment into law on January 13, 1969 invalidated contracts executed between July 1, 1968 and the latter date, and that acts done between the two dates, which were legal when done, were made illegal after the act finally became law.
Notwithstanding the act's stated effective date, it did not go into effect until the date of its passage, January 13, 1969. McLaughlin v. Newark, 57 N.J.L. 298, 302 (Sup. Ct. 1894), aff'd 58 N.J.L. 202 (E. & A. 1895).

VI
The act does not violate N.J. Const. (1947), Art. IV, § VII, par. 4, which provides in relevant part that
To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title * * *
The title of the act reads as follows:
*125 AN ACT to provide for the reclamation, planning, development and redevelopment of the Hackensack meadowlands; creating the Hackensack Meadowlands Development Commission and the Hackensack Meadowlands Municipal Committee; amending and supplementing the "Department of Conservation and Economic Development Act of 1948," approved October 25, 1948 (P.L. 1948, c. 448); and making appropriations to carry out the purposes of this act.
The title of the act accurately reflects its object, which is to reclaim and develop the Hackensack meadowlands. Part A of the act (§§ 1-85, N.J.S.A. 13:17-1 to 87) provides for the Hackensack Meadowlands Development Commission and sets out its duties and powers over the Hackensack meadowlands district. Part B of the act (§§ 86 to 101, N.J.S.A. 13:1B-13 to 13.15) provides a method by which conflicting claims to title of meadowland real property throughout the State may be resolved.
The relationship between the act's two parts and the development of the Hackensack meadowlands does not take too much ingenuity to discern. Part A provides for their physical reclamation, which would at the least be hindered unless an orderly procedure for resolving the problems of clouded title occasioned by O'Neill v. State Highway Department, 50 N.J. 307 (1967), were also provided.
The two parts of the act thus serve to advance the purpose thereof as reflected in its title, viz., "to provide for the reclamation, planning, development and redevelopment of the Hackensack Meadowland."
It is true that the act's title does not catalogue its several provisions. This is the function of an index. Robson v. Rodriquez, 26 N.J. 517, 527 (1958). "The title of a law is only a general statement of purpose and not an index to its provisions." N.J. Mortgage Finance Agency v. McCrane, 56 N.J. 414, 425 (1970). The act and its title contain several objects in furtherance of its purpose. Constitutionally, this is proper.
In Wilson v. Long Branch, 27 N.J. 360 (1958), cert. den. 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958), the Supreme Court considered the title of the Blighted *126 Area Act (L. 1949, c. 187; N.J.S.A. 40:55-21 et seq.), which read:
An act defining "blighted area", authorizing municipalities to determine that areas are blighted areas, and to undertake the clearance, replanning, development and redevelopment of such areas.
The title was attacked because, like the present act, it contained three objects. The court held that
The standard prescribed for the title does not require that it contain a resume, of the provisions of the act. Compliance exists when it expresses the general purpose and when all of the provisions of the legislation appear to be in furtherance of that purpose and appropriate to the end expressed. General Public Loan Corp. v. Director of Div. of Taxation, 13 N.J. 393, 403 (1953). In the present instance (1) the definition, (2) the authorization of municipalities to decide whether a particular area conforms to the definition, and (3) the authorization of municipalities to proceed to clear and redevelop the area are matters integrally related to the single objective, municipal improvement of blighted areas. State on Information of Dalton v. Land Clearance for Redevelopment Auth., 364 Mo. 974, 270 S.W.2d 44, 54 (Sup. Ct. 1954). * * * [27 N.J. at 373]
See also, State v. Zelinski, 33 N.J. 561, 565 (1960).

VII
The act does not violate N.J. Const. (1947) Art. IV, § VII, par. 5, which provides that
No law shall be revived or amended by reference to its title only, but the act revived, or the section or sections amended, shall be inserted at length. No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of the act or which shall enact that any existing law, or any part thereof, shall be applicable, except by inserting it in such act.
Section 86 of the act amended § 17 of L. 1948, c. 448, the Department of Conservation and Economic Development Act of 1948, by inserting the underlined language:
*127 No riparian leases or grants shall hereafter be allowed except when approved by at least a majority of the Resource Development Council and signed by the chairman of the council; and no such leases or grants shall hereafter in any case be allowed except when approved and signed by the Governor and the Commissioner of Conservation and Economic Development.
And Sections 87 through 101 of the act supplemented L. 1948, c. 448, by adding new provisions thereto (N.J.S.A. 13:1B-13.1 to 13.15).
The act complies with the literal provisions of Art. IV. § VII, par. 5. Section 13 of L. 1948, c. 448, the only section thereof which the act amended, is set forth at length in its amended form. The same is also true for the supplementary sections. Compliance with this constitutional provision does not entail the setting forth at length of the unamended sections of the Department of Conservation and Economic Development Act of 1948. Kline v. N.J. Racing Comm'n, 38 N.J. 109, 116 (1962).

VIII
The act does not violate N.J. Const. Art. V, § I, par. 14(b).
On November 25, 1968 Governor Hughes conditionally vetoed the bill which eventually became the act and returned it to the Assembly with his recommendations. The Assembly re-enacted it consistently with the Governor's recommendations, and the Senate concurred in the Assembly's actions, also on November 25, 1968.
These events bring into play the provisions of Art. V, § I, par. 14(b), which provides in relevant part that:
* * * The Governor, in returning with his objections a bill for reconsideration at any general or special session of the Legislature, may recommend that an amendment or amendments specified by him be made in the bill, and in such case the Legislature may amend and re-enact the bill. If a bill be so amended and re-enacted, it shall be presented again to the Governor, but shall become a law only if he shall sign it within ten days after presentation; and no bill shall be returned by the Governor a second time. * * *.
*128 The ten-day period to which this provision speaks commences upon the Legislature's presentation to the Governor of the bill as amended and re-enacted. Plaintiffs incorrectly assume the Legislature presented the act as amended and re-enacted to the Governor on November 25, 1968. The Governor did not receive it until January 10, 1969, as the receipt in the Office of the Secretary of the Senate indicates. The date on which the Governor received the act is clearly the same date on which the Legislature presented it. The Governor signed the act three days later, well within the ten-day constitutional period. See Eagleton Institute of Politics, Rutgers, the State University, The New Jersey Legislature, at 8-10 (1963) for the practices followed in presenting a bill for the Governor's signature.

IX
The act does not offend the rights of the individual plaintiffs (Cheval Brothers et al.) under the Fourteenth Amendment to the United States Constitution; the Equal Protection and Due Process Clauses.
The individual plaintiffs claim that the act subjects them and their property located within the district to controls and restrictions not imposed on property and the owners thereof located outside the district. They claim denial of equal protection of the laws. Their claim is groundless, for the same reason that the act is general and not private, special or local.
* * * the Legislature may classify different types of property owners and treat them differently without offending the fundamental law. The requirement of equal protection is satisfied if all persons within a class reasonably selected are treated alike. And a classification is reasonable if it rests upon some ground of difference having a real and substantial relation to the basic object of the particular enactment or on some relevant consideration of public policy. If there is a reasonable distinction, there is no oppressive discrimination. The Legislature has a wide range of discretion in this area and distinctions will be presumed to rest upon a rational basis if there be any conceivable state of facts which would afford *129 reasonable support for them. [Wilson v. Long Branch, supra, 27 N.J. at 377. See also, Guill v. Mayor, etc., of Hoboken, 21 N.J. 574, 582 (1956), and Robson v. Rodriquez, supra, 26 N.J. at 522-524].
The difference between the Hackensack meadowlands and the rest of the State has been dealt with extensively, supra. The purpose of the act is to reclaim and develop this region. It is not even arguable that the factors which set this region apart from others are also the factors which informed the Legislature's purpose in enacting the law.
The individual plaintiffs fall within the regulated class. The regulations fall equally upon each of them. Thus, for the reasons set forth supra, they suffer no loss of the equal protection of the laws at the hands of the act.
The individual plaintiffs also claim that the act denies them due process of the law, presumably because of the nature of the regulations to which they, as members of the regulated class, are subject.
The guaranty of due process as it applies to cases of the type here under consideration requires only that a law shall not be unreasonable, arbitrary or capricious, and that the means selected shall bear a rational relation to the legislative object sought to be obtained. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405, 414 (1952); Gundaker Central Motors v. Gassert, 23 N.J. 71 (1956). * * * [Robson v. Rodriquez, supra, 26 N.J. at 522, 523].
The purpose of the act, again, is to reclaim the Hackensack meadowlands which, over the course of New Jersey's history, have resisted development for the reasons set forth in § 1 thereof (N.J.S.A. 13:17-1) and the testimony elicited at trial. Both parts of the act are designed to meet the conditions which thus far have thwarted the region's development. The act's substantive provisions are clearly related to the legislative ends sought to be achieved and thus are not arbitrary, capricious or unreasonable. The individual plaintiffs put in no contrary evidence. The act, *130 therefore, does not violate the rights of the individual plaintiffs under the Federal constitution.[9]
The Resource Development Council of the Department of Conservation and Economic Development published its map on January 22, 1970. Thus, the individual plaintiffs were unable to receive any conveyance of the State's interest to lands which they claim within the Hackensack meadowlands during the period January 13, 1969 to January 22, 1970.
The individual plaintiffs each brought independent actions, only portions of which are involved in the case at bar, seeking an order directing the Governor and other named officials to make the conveyances they seek. This aspect of the several complaints is not before this court at the present time, but is mentioned because of its relationship to the due process and equal protection issues discussed herein.
Since the moratorium of which plaintiffs complain is no longer in effect, it would seem their cause of action has been rendered moot, Humble Oil & Refining Co. v. Wojtycha, 48 N.J. 562, 566 (1957), particularly in view of the fact that an action for damages against the State will not lie. Willis v. Dept. of Conservation and Economic Development, 55 N.J. 534 (1970).

X
The act does not violate N.J. Const. (1947), Art. VIII, §§ IV, par. 1, which reads:
The fund for the support of free public schools, and all money, stock and other property, which may hereafter be appropriated for that purpose, or received into the treasury under the provision of any law heretofore passed to augment the said fund, shall be securely invested, and remain a perpetual fund; and the income thereof, except so much as it may be judged expedient to apply to an increase of the capital, shall be annually appropriated to the support of free public schools, for the equal benefit of all the people of the State; and it shall not be competent for the Legislature to borrow, appropriate or use the said fund or any part thereof for any other purpose, under any pretense whatever.
*131 Section 99 of the act (N.J.S.A. 13:1B-13.13) provides that:
The net proceeds from the sale, lease or transfer of the State's interest in the meadowlands shall be paid to the Fund for the Support of Free Public Schools established by the Constitution, Article VIII, Section IV, after deducting from the net proceeds any expenditures of the Hackensack Meadowlands Development Commission for reclaiming land within the district. The amount of said deduction for reclamation shall be paid to the Hackensack Meadowland Development Commission.
Plaintiffs argue that § 99 permits the State to divert the proceeds of the sale of tidelands, which are dedicated to the School Fund, pursuant to Art. VIII, § IV, par. 1, to the Commission to finance its operations.
Section 99 means that whenever property within the district which the Commission has reclaimed is sold, the Commission may deduct its cost of reclamation from the proceeds of the parcel or parcels sold, and remit the net to the Fund for the Support of Free Public Schools. There is no ambiguity in § 99 sufficient to admit to plaintiffs' interpretation which, if correct, would pose serious constitutional questions.
A legislative enactment carries a strong presumption of conformity with the organic law, and mere doubts are not sufficient to negate the presumption. If the language under study admits of two interpretations, one rendering the statute invalid and the other valid, the construction sustaining constitutionality will be adopted. In re Village of Loch Arbour, 25 N.J. 258, 264, 265, 135 A 2d 663 (1957). The doctrine takes on added force when there is a strong societal objective to be served by a declaration of validity. State v. Monroe, 30 N.J. 160, 165 (1959).]

XI
The act does not violate the "one-man, one-vote," principle secured by the Fourteenth Amendment to the United States Constitution.
*132 Art. 4 provides for a Hackensack Meadowlands Municipal Committee (§§ 7 and 8 of the act (N.J.S.A. 13:17-7 and 17-8). The Committee is composed of the mayor of each constituent municipality or his designated representative. The Committee's powers are largely advisory. While § 8(c) provides that it may disapprove any matter which the Commission is required to put before it, such as codes and standards and proposed master plan provisions, the Commission may adopt the matter in question by the affirmative vote of 5 of its 7 members. It will thus appear that the powers of the Municipal Committee are quite circumscribed.
Plaintiffs challenge the composition of the Municipal Committee under the "one-man, one-vote" doctrine. They complain that, for example, the value of Jersey City's vote on the Committee is no greater than that of South Hackensack, despite the fact that its population exceeds that of South Hackensack by many times.
The New York Court of Appeals considered this question in similar circumstances. In Bergerman v. Lindsay, 25 N.Y.2d 405, 306 N.Y.S.2d 898, 255 N.E.2d 142 (1969), cert. den. 398 U.S. 955, 90 S.Ct. 2173, 26 L.Ed.2d 540, it squarely rejected a contention that the composition of the New York City Board of Estimate, which is made up of the presidents of the city's unequally populated boroughs, violated the "one-man, one-vote" principle because the board was a governmental institution neither fitting fully into the role of a legislative body nor had "general governmental powers over the entire geographic area." Obviously, the Hackensack Meadowlands Municipal Committee is cut of the same cloth, if not more so. See also, Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

*133 XII
The Hackensack Meadowlands Development Commission is an instrumentality of the State of New Jersey exercising, within its jurisdiction, essential governmental functions.
Plaintiff South Hackensack raises several issues through which runs a common thread, namely that the Hackensack Meadowlands Development Commission is a private corporation. Such is not the case. Section 5(a) of the act (N.J.S.A. 13:17-5) provides, among other things, that the Commission shall be "a public body corporate and politic"; it shall be "established in, but not of, the Department of Community Affairs"; it shall constitute a political subdivision of the State, established as an instrumentality exercising public and essential governmental functions as an agency of the State.
The powers which the Legislature conferred upon the Commission, particularly as they relate to land use and planning, lie at the heart of the State's power "so to order the affairs of the people as to serve the common social and economic needs, the principle that brought them together in civilized society for their mutual advantage and welfare, to which all property is subject; * * *." Rockhill v. Chesterfield Tp., 23 N.J. 117, 124, 125 (1957).
To exercise the sovereign's power, the act provides for seven commissioners: the Commissioner of Community Affairs ex officio, and six citizen-commissioners appointed by the Governor with the advice and consent of the Senate (§ 5(b) of the act (N.J.S.A. 13:17-5(b)). Thus, the Commission is what the Legislature purports it to be, a public agency of the State of New Jersey acting for and on its behalf. Van Cleve v. Passaic Valley Sewerage Comm'rs, 71 N.J.L. 183, 224 (Sup. Ct. 1904), rev'd on other grounds, 71 N.J.L. 574 (E. & A. 1905).
Plaintiff South Hackensack also complains about the procedure set forth in §§ 90 and 91 of the act (N.J.S.A. 13:1B-13.4 and 13.5) providing for the disposition *134 of conflicting claims between the State and private persons to tide-flowed lands. It claims these provisions constitute an unlawful delegation of the judicial function to the executive. Plaintiff overlooked § 91 (b) of the act, which provides for a plenary judicial proceeding to determine questions of title for anyone aggrieved by the State's claim of ownership.
South Hackensack also complains about § 94 (b) and (c) of the act (N.J.S.A. 13:1B-13.8(b) and (c)), which create a Hackensack Meadowland Negotiation Board and provide that it is empowered conclusively to fix the consideration for the conveyance of the State's interest in any tideland located in the meadowlands district. It claims there are no standards to govern the Board in fixing the price which the buyer must pay for such conveyance.
It is true that no express standards appear on the face of the act to govern the price which the Negotiation Board fixes for the conveyance of state-owned tideland to private persons. It would seem that § 94 tracks, in this regard, provisions appearing in N.J.S.A. 12:3-7, 3-9, 3-15 and 3-16, all of which empower administrative officers to fix the consideration for the State's conveyance of riparian lands without explicit legislative standards.
The reason for the continued absence of legislative standards to prescribe administrative action is that, due to the nature of the property conveyed, which is wholly in the State's domain, they are not constitutionally necessary.
This is seen in the Appellate Division's decision in Bailey v. Driscoll, 34 N.J. Super. 228 (App. Div. 1955), aff'd in part, rev'd in part on other grounds, 19 N.J. 363, (1955).
The court there stated:
* * * The inherent power of the State to grant or lease its lands under tidewater within its territorial limits has been delegated by the Legislature to the Planning and Development Council of the Division of Planning and Development of the Department of Conservation and Economic Development. The Council, subject to the approval of the Governor and the Commissioner of the Department, *135 may grant or lease such lands to whom it will and for such consideration and on such terms as it may fix within the strict limits laid down by the Legislature. It may likewise refuse to convey; a grant cannot be compelled by any one * * *.

* * * * * * *
* * * Of course, the [Resource Development] Council is entrusted with complete discretion as to whether it will convey anything and, if so, at what price, but that is not involved here. * * * [34 N.J. Super. at 252-253].
The proposition reflected in Bailey is simply stated: since there is no right to a conveyance of the State's interest in riparian property, there is no right which the Constitution could protect attendant to such conveyance. The State may set such price at it sees fit, and whether this uncontrolled discretion is exercised by the Legislature or an administrative body is legally immaterial.

XIII
Some plaintiffs take the position that the admittedly complex provisions of Art. 9 of the act constitute a delegation of taxing power to a "pool" of municipal officials, i.e., the governing bodies of each of the constituent municipalities, with the size of each municipal budget being "weighted" in its effect on the "pool" decisions. Yet, they say, this pool of officials does not exercise political powers  powers of local self-government throughout the district in entity form. Their only powers are expressed through the aegis of the Hackensack Meadowlands Municipal Committee consisting of the chief executive of each constituent municipality within the district, as established in Art. 4 of the act giving the Committee a limited veto over major decisions of the Meadowlands Commission.
Thus, efficiency in governmental operation results in fiscal disadvantage, while profligate spending is fiscally rewarded  i.e., vis-a-vis the operative effect on inter-municipal tax-sharing and guarantee payments under the formulas provided in Art. 9 of the act heretofore discussed. *136 They say, further, that this possibility in some manner violates:
(1) A constitutional requirement that the power of local taxation must be limited to political districts for the purpose of enabling them to exercise the powers of government conferred upon them within their locality, and
(2) The maxim that "taxation and representation go together."
This argument is difficult of comprehension. Factually, municipality A's wasteful administration could conceivably result in municipality B having to pay more into the inter-municipal tax-sharing account despite its frugality in performing governmental service within its borders than would be the case if municipality A observed the same efficiency and frugality as B. To project this posture of facts to a conclusion that municipality A is, in effect, levying taxes in municipal B strains credulity, at least within the context of the constitutional tax provisions herein discussed.
The act projects in new and far-reaching dimensions the sense of an enlightened Legislature that in these complex times the limits of certain constitutional doctrines, first tested in simpler times when the allocation of powers between the State and its municipalities was perhaps easier of resolution, should be re-examined and re-evaluated. While stated in another context, a recent declaration of our Supreme Court is quite appropriate in the setting of the instant case:
The concept of "public purpose" is broad and is merely a reflection of the changing needs of society. As the needs change, the area of permissible governmental activity must change to meet those needs. [New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414, 420 (1970)].
Of equal importance is the maxim that
There is a strong presumption that a statute is constitutional [citations omitted], and a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable *137 doubt. * * * [Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 388 (1959)].
For the foregoing reasons I find the act under consideration valid.
NOTES
[1] Senator Dickinson, the sponsor of Senate Bill 477 (1968), which became the act, placed a public notice of his intention to apply therefor in the Bergen Record, the Jersey Journal and the Hudson Dispatch, published respectively in Bergen and Hudson Counties. The notice appeared in the Jersey Journal on February 3, 1968 and in the Record and Dispatch on February 5, 1968. Senator Dickinson introduced the bill in the Senate on February 13, 1968. Defendant observed that this demonstrated nothing more than excess of caution on the sponsor's part and does not justifiably generate a conclusion that the legislation is special as a result. It is conceded by defendant that the local government petition, a condition precedent to enactment, lacks compliance.
[2] Not all municipalities will have a gross obligation each year. In some instances, because of demolition of present ratables, there may be a loss in aggregate true value. In such a case, the municipality would receive a guarantee payment.
[3] Unlike, for instance, the county tax, which the municipalities assess, collect and remit to the counties based upon the amount which the latter certify to the former (N.J.S.A. 54:4-41, 4-55), no part of the meadowland adjustment payments, by express provision of the act (§ 59(a), N.J.S.A. 13:17-60), goes to the Commission, with the exception of a small amount directly related to its cost of administering the inter-municipal account. There is no correlative provision in the act to N.J.S.A. 54:4-76, which provides that if a municipality has insufficient funds to pay the county tax assessed against it, it must borrow the money. See also, Booth v. Parnell, 12 N.J. Misc. 413, 415 (Sup. Ct. 1934).
[4] One can find other instances in which the State has imposed expenses related to a public purpose on its political subdivisions, the payment of which must be raised by taxation. For example, see N.J.S.A. 19:48-3.5, 3.8, 3.9 and 3.10, which together provide that the State may purchase voting machines for use in counties of the first and second class and require said counties to repay the State for the cost thereof out of the first tax moneys each receives from its municipalities. It does not appear that these provisions have been challenged.
[5] Cf. 2 McQuillin, Municipal Corporations, § 4.159 and Easton and Amboy R.R. Co., v. Central R.R. Co., 52 N.J.L. 267, 275 (Sup. Ct. 1890).
[6] Cf. Jersey City v. Zink, 133 N.J.L. 437 (E. & A. 1945). While the principle of absolute state domination of political subdivisions is logically sound, given the fact that the latter are the creatures of the former, in practical terms it is better that this principle not be given unrestricted effect. Consequently, the several states have adopted various constitutional provisions to restrict the states' dominion over their cities. The Montana Constitution prohibits the legislature from imposing a tax on the property or inhabitants of any political subdivision for local  as against governmental  purposes (1 Revised Codes of Montana, Constitution, Art. XII, § 4). The decisions under constitutions with this type of restriction focus on the question of the purpose for which the tax is imposed; if it is municipal, the act imposing it is invalid, if it is governmental, it is not, State ex rel. Gerry v. Edwards, 42 Mont. 135, 111 P. 734 (Sup. Ct. 1910). The resolution of the often tissue-thin distinction between municipal and governmental purposes often leads to decisions with the predictive value of a flip of a coin. See Annocations, 46 A.L.R. 640 (1927); 106 A.L.R. 910 (1937).
[7] In the case of Art. 9 of the act the Legislature has specified in great detail the manner in which gross payments into the inter-municipal account are to be computed (§ 65 of the act, supra). It also specified the manner in which "credits" against such payments were to be computed in order to arrive at the net meadowland adjustment payment (§§ 66, 67, 68 and 70).

The only matter over which the Legislature has left any flexibility is in the allowance of a project payment (§ 69), which, as was mentioned above, is a payment made by the Commission to a municipality whenever, in the Commission's judgment, a municipal improvement which the municipality and not the Commission initiates serves also to benefit the district generally and is consistent with the Commission's master plan. Since a project payment, if made, would act as a credit against the amount the municipality receiving it would otherwise pay into the inter-municipal account, the Commission's exercise of discretion in this instance works not to impose a cost upon the municipality but to reduce the amount of the adjustment payment by the the amount of the project payment.
Of course, if the Commission determined to make a project payment, the funds available to be paid as apportionment payments would be reduced by the amount thereof. This, in turn, would result in contributing municipalities paying a greater amount into the inter-municipal account and recipient municipalities receiving a lesser amount.
This attenuated result of the Commission's determination is so remote from the principle which Bernards and Van Cleve contemplated that to apply it here would be to exalt scholasticism over an appreciation of the purposes which the Legislature intended the project payments to serve. A legislative delegation must be judged in the light of what is practical, Alaska Steamship Co. v. Mullaney, 180 F.2d 805, 822, 12 Alaska 594 (9 Cir.1950). If the act required the Commission to repay the cost of all municipal projects which were consistent with the master plan and conferred a regional benefit, it could find itself spending all its funds on project payments. The Legislature took a more practical approach. It carefully qualified the Commission's power to grant a project payment. The Commission must first find that the project to which the payment relates (1) serves a regional as against a purely local purpose, and (2) is consistent with the Commission's master plan for the district. Thereafter the Commission may determine whether other circumstances such as the condition of the inter-municipal account are such that a particular project payment would be warranted. Thus, if legislative delegation there be, its exercise is not in the Commission's untrammeled discretion. Unlike the circumstances dealt with in Van Cleve and Bernards, the Legislature imposed standards which must be met before the Commission may allow a project payment. These standards, absent in the earlier decisions, guide the Commission in the exercise of its power to grant project payments into constitutionally permissible channels. Little Ferry v. Bergen County Sewer Authority, 9 N.J. 536, 543, 544; State v. Hotel Bar Foods, Inc., 18 N.J. 115, 124 (1955); Schierstead v. Brigantine, 20 N.J. 164 (1955).
[8] The phrase, "for the use of such taxing district," appearing therein clearly refers, when viewed in the context of the 1947 Constitutional Convention, to the application of the tax rate of the particular municipality to Class II railroad and similar real property located in that municipality on which the State assesses and collects the tax. There is nothing in the Proceedings which would give comfort to a possible plaintiffs' theory that Art. 8 prohibits the use of revenues raised locally for other than purely local purposes. This theory would do violence to the principle that all taxes are state taxes. If plaintiff's theory were true, extensive discussion and debate on the departure from this long accepted principle would be expected. Research in the Proceedings discloses none.
[9] Section 88 of the act (N.J.S.A. 13:1B-13.2) imposes a moratorium upon the State's conveyance of title to any property within any area, subject to a title study and survey to determine the State's claim of ownership therein. Section 88 required that a title study and survey of the Hackensack meadowlands be conducted forthwith after the effective date of the act.