MICHAEL MATTHEWS, PLAINTIFF-APPELLANT, v. CITY OF ATLANTIC CITY AND STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS, AND THOMAS BUDNICK AND VINCENT GRANESE, INTERVENORS-RESPONDENTS.

Argued April 29, 1980—Decided July 30, 1980.

154

*George L. Seltzer* argued the cause for appellant (*Alten, Valentine, Seltzer & Shultz,* attorneys; *Richard D. Alten, George L. Seltzer* and *William W. Shultz,* on the briefs).

*David P. Schneider,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*John J. Degnan,* Attorney General of New Jersey; *Stephen Skillman,* Assistant Attorney General, of counsel).

*Edward N. Fitzpatrick* argued the cause for intervenors-respondents (*Clapp & Eisenberg,* attorneys; *Allyn Z. Lite* and *Frederick S. Kessler,* on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

The Commission Form of Government Law, *N.J.S.A.* 40:70–1 *et seq.,* also known as the Walsh Act, *L.* 1911, *c.* 221 (as amended), provides that in an applicable municipality a member of the board of commissioners, the elected governing body, "shall have been a citizen and resident of the municipality for at least two years immediately preceding his election." *N.J.S.A.* 40:72–1; see *N.J.S.A.* 40:72–2. The question presented is whether this restriction on eligibility for public office violates the Equal Protection Clause of the federal constitution, *U.S. Const.,* Amend. XIV. Although we recognize that the Legislature has the power to impose durational residency requirements

on candidates for local elective office, we conclude that a two-year residency requirement substantially infringes upon the voter's right to exercise his franchise. Regardless of whether the State could impose such a requirement on elective officers in all municipalities, it has not justified its unequal treatment of candidates under the Walsh Act. We therefore declare the residency requirement unconstitutional.

## I

The facts are not in dispute. Plaintiff became a resident of defendant Atlantic City in November or December of 1979, and registered to vote in the city on December 31, 1979. He was formerly a resident of Linwood, another Atlantic County municipality. In April 1980, Matthews filed with the city a "petition of nomination," N.J.S.A. 40:75–3, for the office of city commissioner.[1] He also commenced the present action, seeking a declaration that the two-year residency requirement for the office, N.J.S.A. 40:72–1, was unconstitutional.[2] The relief requested by

---

[1] Having adopted the commission form of government under the Walsh Act, Atlantic City is governed by a board of five elected commissioners that has "all the executive, administrative, judicial and legislative powers" of municipal government. N.J.S.A. 40:72–1, –2. The commissioners all serve concurrent terms of four years, N.J.S.A. 40:75–2; candidates receiving the five highest totals of votes are elected, N.J.S.A. 40:75–19.

[2] Plaintiff also sought a declaration that N.J.S.A. 40:75–4 was unconstitutional if it imposed the same two-year residency requirement. That provision requires those signing a petition of nomination to certify that the candidate is "a qualified elector of the municipality." In the alternative, plaintiff asserted that the phrase "qualified elector" appearing in the petition did not create a separate residency or registration requirement, but merely stated the formal contents of a petition.

We find the appropriate significance to be given "qualified elector" is the common understanding of a person signing a petition containing such language. Thus, if the prescribed contents of the petition impliedly impose any requirement on a candidate, it is simply that he be registered to vote, for this is the common understanding of "qualified elector." Since Matthews was registered when he was preparing his petition, we may presume that he satisfied any requirement implicit in N.J.S.A. 40:75–4 without deciding whether one exists.

plaintiff would permit his name to be placed on the ballot for the May 13 municipal election.[3]

After the trial court issued an order to show cause, Thomas Budnick and Vincent Granese, residents and taxpayers of Atlantic City, petitioned for and received leave to intervene in the action. The trial court heard arguments on April 16, 1980, and in a written opinion dated April 18 held the residency requirement constitutional. It rejected Matthews' argument that conditioning eligibility for local office on two years' residence violated the Equal Protection Clause. Noting that in *Stothers v. Martini*, 6 *N.J.* 560 (1951), this Court had upheld *N.J.S.A.* 40:72–1 against a similar attack, the trial court found no basis for departing from the reasoning or the result in that case. Plaintiff appealed and the Appellate Division affirmed substantially for the reasons expressed by the trial court. We granted certification.[4] 84 *N.J.* 152 (1980). We reverse.

## II

In *Stothers v. Martini, supra,* this Court rejected an equal protection challenge to the durational residency requirement involved here. The Court noted that because the Legislature was empowered to prescribe qualifications for elective office, the statute would be presumed to be valid and would be "upheld unless it is shown to be arbitrary, capricious or unreasonable." 6 *N.J.* at 567. Applying that standard, the Court concluded that the two-year requirement was a proper measure for "insur[ing]

---

[3]In apparent response to an unpublished decision of the Superior Court, Law Division, holding *N.J.S.A.* 40:72–1 unconstitutional, *Solomon v. Atlantic City*, Docket No. L–32127–75 (Law Div. April 15, 1976), the city had imposed its own residency requirement of 40 days, which Matthews had satisfied. Since neither the State nor intervenors were parties to this earlier action, we have no occasion to consider whether the city would be bound by the former judgment under the doctrine of collateral estoppel. See *United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co.*, 74 *N.J.* 92 (1977).

[4]We also directed that the parties submit supplemental briefs to address the constitutionality of *N.J.S.A.* 40:72–1 under *Gangemi v. Rosengard*, 44 *N.J.* 166 (1965). See discussion *infra* at 171–173.

that city commissioners have at least a rudimentary understanding of local affairs." *Id.*

Plaintiff contends that an examination of developments in constitutional law since *Stothers* leads to a result contrary to that reached in 1951. Specifically, he urges that the United States Supreme Court decisions in *Bullock v. Carter*, 405 *U.S.* 134, 92 *S.Ct.* 849, 31 *L.Ed.*2d 92 (1972), and *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.*2d 274 (1972), require application of a more stringent standard of review to the statute in question—a standard which plaintiff claims *N.J.S.A.* 40:72–1 cannot meet. Accordingly, we begin our inquiry by considering those two decisions.

## A

In *Bullock* the Supreme Court addressed the validity of Texas' requirement of filing fees in primary elections. The fees were set sufficiently high so that primary elections would be financed by the candidates instead of the state. According to the Court, the "threshold question" was

> whether the filing-fee system should be sustained if it can be shown to have some rational basis, or whether it must withstand a more rigid standard of review. [405 *U.S.* at 142, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99 (footnote omitted)]

The Court noted that prior decisions had established that direct restrictions on the right to vote required the closest judicial scrutiny. *Id.*; see *Harper v. Virginia Board of Elections*, 383 *U.S.* 663, 86 *S.Ct.* 1079, 16 *L.Ed.*2d 169 (1966). Rejecting traditional strict scrutiny, the Court explained that the "problem presented by candidate filing fees is not the same * * *." *Bullock*, 405 *U.S.* at 142, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99. The difference was that "[t]he initial and direct impact of filing fees is felt by aspirants for office, rather than voters * * *." *Id.* This was significant for the *Bullock* Court because it had never "attached such fundamental status to candidacy as to invoke a rigorous standard of review." *Id.* at 142–143, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99.

> However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or

incidental burden on the exercise of voting rights is subject to a stringent standard of review. * · *   *   In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters. [*Id.* at 143, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99–100 (footnotes and citations omitted)]

The Court concluded that the barrier to the ballot created by the filing-fee system had affected voters in ways "neither incidental nor remote." *Id.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. "[T]his system falls with an unequal weight on voters, as well as candidates, according to their economic status." *Id.* This observation was sufficient to trigger a more exacting standard of review than the "rational basis" standard:

Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper* [v. *Virginia Bd. of Elections*], that the laws must be "closely scrutinized" and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster. [*Id.* (quoting *Harper*, 383 *U.S.* at 670, 86 *S.Ct.* at 1083)]

Applying this standard, the *Bullock* Court found that the state's interests in regulating the ballot and relieving its treasury of the cost of conducting primary elections were insufficient to justify the "resulting incursion on the prerogatives of voters." 405 *U.S.* at 149, 92 *S.Ct.* at 859, 31 *L.Ed.*2d at 103. It accordingly declared the scheme of filing fees unconstitutional.

*Dunn v. Blumstein* involved provisions of Tennessee law that extended the right to vote only to those citizens who had resided within the state for one year and within the county in which they would vote for three months. 405 *U.S.* at 331, 92 *S.Ct.* at 997, 31 *L.Ed.*2d at 278. The Court held that the restriction implicated two fundamental rights: the right to vote and the right to travel. In regard to the former, the Court noted that "it is certainly clear now that a more exacting test [than minimal scrutiny] is required for any statute that 'place[s] a condition on the exercise of the right to vote.' " *Id.* at 337, 92 *S.Ct.* at 1000, 31 *L.Ed.*2d at 281 (quoting *Bullock*, 405 *U.S.* at 143, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99). It therefore concluded that it "must determine whether the exclusions are *necessary* to promote a *compelling* state interest." *Id.* (quoting *Kramer v. Union Free Sch. Dist.*, 395 *U.S.* 621, 627, 89 *S.Ct.* 1886, 1889, 28

*L.Ed.*2d 583, 589 (1969) (emphasis in original)). Since the durational residency requirement penalized certain residents on the basis of recent travel, the Court held strict scrutiny was also necessary to sustain the requirement as an infringement of the fundamental right to travel. 405 *U.S.* at 342, 92 *S.Ct.* at 1003, 31 *L.Ed.*2d at 284.

Applying strict scrutiny, the *Dunn* Court examined the state's proffered justifications for the residency requirement—preventing fraudulent voting and assuring the knowledgeable exercise of the franchise. They were held inadequate. Since the durational residency requirement prevented voting by newly arrived yet *bona fide* residents as well as non-residents, the Court considered it an "all too imprecise" means of preventing fraud. 405 *U.S.* at 351, 92 *S.Ct.* at 1007, 31 *L.Ed.*2d at 289. The Court also found the requirement was "much too crude" a device for promoting knowledgeable voting. The state showed no necessity for requiring a year's residency to insure that voters were adequately informed. *Id.* at 360, 92 *S.Ct.* at 1012, 31 *L.Ed.*2d at 294. New residents could not vote regardless of the level of their awareness about community affairs; long-time residents were permitted to vote regardless of the lack of such awareness. *Id.* at 357–358, 92 *S.Ct.* at 1010–1011, 31 *L.Ed.*2d at 293–294. The Court rejected as impermissible the state's asserted objective of insuring that a voter has a " 'common interest in all matters pertaining to [the community's] government . . . .' " *Id.* at 355, 92 *S.Ct.* at 1009, 31 *L.Ed.*2d at 291–292. " '[D]ifferences of opinion' may not be the basis for excluding any group or person from the franchise." *Id.* (quoting *Cipriano v. City of Houma,* 395 *U.S.* 701, 705–706, 89 *S.Ct.* 1897, 1900, 23 *L.Ed.*2d 647 (1969). Since none of the state's purported justifications for the residency requirement was found sufficiently compelling, the Court declared it unconstitutional.

## B

We agree with plaintiff that since this Court decided *Stothers,* state legislation affecting the electoral process has been subjected to closer constitutional scrutiny. We should therefore reas-

sess the reasoning and result of *Stothers* in the light of contemporary approaches to issues of equal protection. This reassessment requires both a fresh analysis of the competing interests involved and a reconsideration of the proper standard for reviewing the Legislature's balancing of those interests.

> To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. [*Dunn v. Blumstein*, 405 *U.S.* at 335, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 280]

Stated differently, the question is whether the Equal Protection Clause demands less deference than that given by *Stothers* to the legislative judgment underlying a durational residency requirement for local elective office.

Turning first to the character of the classification involved, we note that it is not based on any "suspect" criterion. It draws a distinction between residents solely on the basis of length of residence. This denotes neither a "discrete and insular minorit[y]," *United States v. Carolene Products Co.*, 304 *U.S.* 144, 152–153 n.4, 58 *S.Ct.* 778, 783–784, 82 *L.Ed.* 1234 (1938), nor "an immutable characteristic determined solely by the accident of birth," *Frontiero v. Richardson*, 411 *U.S.* 677, 686, 93 *S.Ct.* 1764, 1770, 36 *L.Ed.*2d 583 (1973), that would require the minimum of judicial deference embodied in the notion of strict scrutiny. See, *e. g., Weber v. Aetna Cas. & Surety Co.*, 406 *U.S.* 164, 92 *S.Ct.* 1400, 31 *L.Ed.*2d 768 (1972); *Graham v. Richardson*, 403 *U.S.* 365, 91 *S.Ct.* 1848, 29 *L.Ed.*2d 534 (1971).

With regard to the individual interests involved, we recognize that the right to be a candidate for office has never been held by either the United States Supreme Court or this Court to enjoy "fundamental" status. *Bullock v. Carter, supra; Wurtzel v. Falcey*, 69 *N.J.* 401 (1976). Nevertheless, the relationship between the right to vote and the right to run for elective office cannot be ignored. As Chief Justice Weintraub observed,

> the right to vote would be empty indeed if it did not include the right of choice for whom to vote. * * * [I]n judging the validity of a restraint upon

eligibility for elective office, we must be mindful that the restraint is upon the right to vote as well. [*Gangemi v. Rosengard*, 44 *N.J.* 166, 170 (1965)]

See *Bullock*, 405 *U.S.* at 143, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 100 (quoted *supra* at 158). In general, an individual's freedom of choice in exercising his franchise is a fundamentally important interest. An individual candidate's fitness—including the depth or intensity of his knowledge or interest in local affairs—is ultimately an issue for the voters. See *Gangemi*, 44 *N.J.* at 174. Yet the existence of legislative authority to prescribe minimum qualifications for elective positions is as clear as the public's right to be the ultimate judge of fitness. Although the line separating basic qualifications for a particular office and the general fitness of a particular candidate is "more easily felt than described," *Gangemi*, 44 *N.J.* at 171, we must apply a standard of judicial scrutiny that is properly sensitive to the public and individual interests on either side of that line.

The extent to which the interests of the State may infringe upon the individual's freedom of electoral choice determines the proper standard of judicial review. The parties here disagree over the content of that standard. Plaintiff claims that *Bullock* and *Dunn* require "strict scrutiny"; defendant and intervenors contend that because these cases do not address the present question, minimal scrutiny is all that is required. The United States Supreme Court has not yet addressed a challenge to a restriction on candidacy based on the duration of residence. Lower federal courts and courts of other states, however, have considered the issue presented here. Although not binding, those decisions are instructive.

Courts of other jurisdictions have taken widely varying positions on both the interests involved in residency requirements for elective office and the appropriate standard of judicial scrutiny. At one extreme, the California Supreme Court has held that durational residency requirements infringe upon three "fundamental interests": the right to hold public office, the right to vote and the right to travel. As a consequence that court determined that strict scrutiny is required in such cases. See *Johnson v. Hamilton*, 15 *Cal.*3d 461, 125 *Cal.Rptr.* 129, 541 *P.*

2d 881 (1975) (in bank); *Thompson v. Mellon*, 9 *Cal.*3d 96, 107 *Cal.Rptr.* 20, 507 *P.*2d 628 (1973). Applying strict scrutiny compelled that court to conclude that "any durational residence requirement for candidates for local office in excess of [30 days] is violative of the equal protection clause of the Fourteenth Amendment." *Johnson v. Hamilton*, 125 *Cal.Rptr.* at 135, 541 *P.* 2d at 887.

The courts in *Sununu v. Stark*, 383 *F.Supp.* 1287 (D.N.H. 1974), aff'd mem., 420 *U.S.* 958, 95 *S.Ct.* 1346, 43 *L.Ed.*2d 435 (1975), and *Chimento v. Stark*, 353 *F.Supp.* 1211 (D.N.H. 1973), aff'd mem., 414 *U.S.* 802, 94 *S.Ct.* 125, 38 *L.Ed.*2d 39 (1973), rejected the claim that First Amendment rights were implicated, but relied on *Dunn* and *Bullock* to hold that a durational residency requirement encroached upon the rights to travel and to vote. While in both cases the court required the application of the "compelling state interest" test, see *Sununu, supra*, 383 *F.Supp.* at 1290; *Chimento, supra*, 353 *F.Supp.* at 1214; but see *Sununu, supra*, 383 *F.Supp.* at 1292–1293 (Campbell, J., concurring); *Chimento, supra*, 353 *F.Supp.* at 1218 (Campbell, J., concurring), both upheld seven-year residency requirements for state offices in New Hampshire—state senator in *Sununu* and governor in *Chimento*. Finding infringements of the same rights of travel and of franchise, the Third Circuit has also applied strict scrutiny to declare unconstitutional a five-year residency requirement for the office of mayor. *Wellford v. Battaglia*, 485 *F.*2d 1151 (3d Cir. 1973); see also *Henderson v. Fort Worth Indep. Sch. Dist.*, 526 *F.* 2d 286 (5th Cir. 1976) (applying strict scrutiny based on right to vote and invalidating four-year residency requirement for member of local board of education); *Mogk v. City of Detroit*, 335 *F.Supp.* 698 (E.D.Mich. 1971) (applying strict scrutiny based on right to vote and striking down three-year residency requirement for member of city charter commissions).

In *Green v. McKeon*, 468 *F.*2d 883 (6th Cir. 1972), the court declined to decide whether *Bullock* required strict scrutiny because it found, on the authority of *Dunn*, that a durational residency requirement impinged on the right to travel. Al-

though unlike *Dunn*, the penalty imposed on recent migration in *Green* was not the denial of the fundamental right to vote, the court nevertheless held strict scrutiny was required. Applying this test the court struck down a two-year residency requirement for city office candidates.

At the other extreme are those decisions which subjected durational residency requirements to traditional, minimal judicial scrutiny. In *Antonio v. Kirkpatrick*, 579 *F.*2d 1147 (8th Cir. 1978), the court found that a ten-year residency requirement for the elective office of state auditor impinged only minimally on the rights to vote and to travel. Rejecting strict scrutiny, the court nevertheless found that the ten-year requirement did not bear a rational relationship to a legitimate state objective. The court in *Walker v. Yucht*, 352 *F.Supp.* 85 (D.Del. 1972), also applied the traditional rational basis test to a residency requirement. It found that strict scrutiny was not required because no discrete minority of voters was prejudiced and the residency requirement did not amount to a penalty on the exercise of the right to travel. Under the rational basis test the court sustained a three-year residency requirement for the office of state representative. See also *Brewster v. Johnson*, 260 *Ark.* 450, 541 *S.W.* 2d 306 (1976) (applied rational basis test and upheld one-year residency requirement for state representative; also noted that statute would pass muster under strict scrutiny).

The only New Jersey case dealing directly with residency requirement since *Stothers* apparently applied both standards of scrutiny in sustaining a one-year residency requirement on candidates for State Assembly. *Ammond v. Keating*, 150 *N.J.Super.* 5 (App.Div. 1977).

The variations in these decisions may largely be ascribed to an attempt to fit residency requirements into what is often called the "two-tier" analysis of equal protection claims. This approach divides all legislative classifications into two categories for purposes of judicial review. Where "fundamental rights" or "suspect classes" are involved in the classification, it is subjected to "strict scrutiny": the state is required to demonstrate that a compelling objective justifies the classification and that the

particular classification undergoing examination is necessary to accomplish the objective. Where such rights or classes are not involved, the classification is subjected to "minimal scrutiny": the court merely inquires whether a conceivable, legitimate objective exists for the classification and whether that classification is rationally related to the objective. The rigid assumption of this analysis—that legislative classifications are either presumptively invidious or presumptively valid—offers little guidance in an area where important individual and governmental interests are in conflict. We are reminded of Justice Holmes' observation that if a consistent pattern does not appear in judicial decisions, this indicates that the law on a subject is in a process of growth. O. W. Holmes, *The Common Law* 32 (Howe ed. 1963).

Members of the United States Supreme Court have recognized the inadequacy of a rigid dichotomy between strict and minimal scrutiny on more than one occasion. See *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 *U.S.* 173, 188–189, 99 *S.Ct.* 983, 992–993, 59 *L.Ed.*2d 230, 244 (1979) (Blackmun, J., concurring); *Craig v. Boren,* 429 *U.S.* 190, 210–211 n., 97 *S.Ct.* 451, 463–464 n., 50 *L.Ed.*2d 397, 415 n. (1976) (Powell, J., concurring);[5] *id.* at 211–212, 97 *S.Ct.* at 464, 50 *L.Ed.*2d at

---

[5]Justice Powell stated in his concurring opinion:

As is evident from our opinions, the Court has had difficulty in agreeing upon a standard of equal protection analysis that can be applied consistently to the wide variety of legislative classifications. There are valid reasons for dissatisfaction with the "two-tier" approach that has been prominent in the Court's decisions in the past decade. Although viewed by many as a result-oriented substitute for more critical analysis, that approach—with its narrowly limited "upper-tier"—now has substantial precedential support. As has been true of *Reed* [*v. Reed,* 404 *U.S.* 71, 92 *S.Ct.* 251, 30 *L.Ed.*2d 225 (1971) ] and its progeny, our decision today will be viewed by some as a "middle-tier" approach. While I would not endorse that characterization and would not welcome a further subdividing of equal protection analysis, candor compels the recognition that the relatively deferential "rational basis" standard of review normally applied takes on a sharper focus when we address a gender-based classification. So much is clear from our recent cases. For thoughtful discussions of equal protection analysis, see, *e. g.,* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court:

415–416 (Stevens, J., concurring); *Dandridge v. Williams*, 397 *U.S.* 471, 519–521, 90 *S.Ct.* 1153, 1178–1180, 25 *L.Ed.2d* 491, (1970) (Marshall, J., dissenting); see also *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 80 *N.J.* 6, 42–44 (1976), app. dism. and *cert.* den. *sub nom. Feldman v. Weymouth Tp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977); *Robinson v. Cahill*, 62 *N.J.* 473, 491–492 (1973), *cert.* den. *sub nom. Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973). Indeed, it has been suggested that Supreme Court decisions evidence a new mode of equal protection analysis—described as adding "bite" to the "traditionally toothless minimal scrutiny standard"—that the Court employs in certain cases where fundamental interests or suspect classes are not involved. Gunther, "The Supreme Court 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection," 86 *Harv.L.Rev.* 1 (1972). See *Trimble v. Gordon*, 430 *U.S.* 762, 97 *S.Ct.* 1459, 52 *L.Ed.2d* 31 (1977); *Craig v. Boren*, 429 *U.S.* at 210–211, 97 *S.Ct.* at 463–464, 50 *L.Ed.2d* at 415 (Powell, J., concurring); *Vlandis v. Kline*, 412 *U.S.* 441, 458–459, 93 *S.Ct.* 2230, 2239–2240, 37 *L.Ed.2d* 63 (1973) (White, J., concurring in judgment); *Chicago Police Dept. v. Mosley*, 408 *U.S.* 92, 92 *S.Ct.* 2286, 33 *L.Ed.2d* 212 (1972); *Weber v. Aetna Casualty & Surety Co.*, 406 *U.S.* 164, 92 *S.Ct.* 1400, 31 *L.Ed.2d* 768 (1972); see also *Wurtzel v. Falcey, supra*, 69 *N.J.* at 411 n.6 (Pashman, J., dissenting); Wilkinson, "The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality," 61 *Va.L.Rev.* 945 (1975). This new model would close the wide gap between strict and minimal scrutiny by bringing a "sharper focus" to judicial inquiry into legislative motivations and avoiding a virtual abdication of genuine scrutiny. See

A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972); Wilkinson, The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va.L.Rev. 945 (1975).

Justice Brennan stated in *Univ. of Cal. Regents v. Bakke*, 438 *U.S.* 265, 357 n.30, 98 *S.Ct.* 2733, 2782 n.30, 57 *L.Ed.2d* 750, 813 n.30 (1978) (concurring and dissenting): "We do not pause to debate whether our cases establish a 'two-tier' analysis, a 'sliding scale' analysis, or something else altogether."

*Craig v. Boren,* 429 *U.S.* at 210–211n., 97 *S.Ct.* at 463–464n., 50 *L.Ed.*2d at 415n. (Powell, J., concurring); *Gunther, supra,* at 24. *Craig v. Boren, supra,* is an example of this newer approach. At issue was the constitutionality of an Oklahoma statute which prohibited the sale of 3.2% beer to males under the age of 21 and to females under the age of 18. Writing for the Court, Justice Brennan declared the act unconstitutional. He stated that gender-based classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." 429 *U.S.* at 197,[6] 97 *S.Ct.* at 457. Justice Brennan rejected the state's statistical evidence because it offered a "weak answer to the equal protection question presented here." *Id.* at 201, 97 *S.Ct.* at 459. The state failed to show that the difference in treatment between males and females satisfied the *Craig* Court's standard of scrutiny.

The appropriateness of intermediate scrutiny depends upon the character of the legislative classification and the importance of the rights affected. It may be that an offensive classification is involved that is "not as obnoxious as some the Court has condemned," *Craig,* 429 *U.S.* at 212, 97 *S.Ct.* at 464, (Stevens, J., concurring). See, *e.g., Stanton v. Stanton,* 421 *U.S.* 7, 95 *S.Ct.* 1373, 43 *L.Ed.*2d 688 (1975); *Reed v. Reed,* 404 *U.S.* 71, 92 *S.Ct.* 251, 30 *L.Ed.*2d 225 (1971). In other cases calling for intermediate scrutiny, a fundamental right is substantially affected in an indirect manner. Thus, it has been held that restrictions on eligibility for elective office can indirectly infringe on the fundamental right to vote such that minimal scrutiny is not appropriate. See *Bullock v. Carter, supra.*

■ Nevertheless, if fundamental interests or suspect classes are present, we are not free to apply an intermediate approach. We may sustain a classification only if the means chosen are "necessary to promote a *compelling* governmental interest \* \*." *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 *U.S.* 1, 31, 93

---

[6]Compare *Bullock v. Carter, supra,* which required close scrutiny of the statute to determine whether the law was reasonably necessary to accomplish a legitimate state objective. See *supra* at 159.

*S.Ct.* 1278, 1296, 36 *L.Ed.2d* 16, 42 (1973) (quoting *Shapiro v. Thompson,* 394 *U.S.* 618, 634, 89 *S.Ct.* 1322, 1331, 22 *L.Ed.2d* 600 (1969)); see, *e.g., Eisenstadt v. Baird,* 405 *U.S.* 438, 447 n.7, 92 *S.Ct.* 1029, 1035, n.7, 31 *L.Ed.2d* 349, 31 *L.Ed.2d* 349, 359 n.7 (1972); *Kramer v. Union Free Sch. Dist.,* 395 *U.S.* 621, 627, 89 *S.Ct.* 1886, 1889, 23 *L.Ed.2d* 583, 589 (1969). Plaintiff argues that this standard of review must be applied here. We disagree.

There is no fundamental right to run for office. *Bullock, supra,* 405 *U.S.* at 142–143, 92 *S.Ct.* at 855, 31 *L.Ed.2d* at 99; *Turner v. Fouche,* 396 *U.S.* 346, 90 *S.Ct.* 532, 24 *L.Ed.2d* 567 (1970); *Wurtzel v. Falcey, supra.* The residency requirement before us does not directly interfere with the exercise of the fundamental right to vote. Nor do we consider the statute to penalize impermissibly the fundamental right to travel.[7] As the Supreme Court explained in *Memorial Hospital v. Maricopa County,* 415 *U.S.* 250, 256, 94 *S.Ct.* 1076, 1081, 39 *L.Ed.2d* 306, 314 (1974), durational requirements are not *per se* unconstitutional, despite the fact that they always burden to some extent the exercise of the right to travel. Because here no fundamental right or basic necessity of life is denied, the burden does not assume constitutional proportions. *Id.* at 258–259, 94 *S.Ct.* at 1082, 39 *L.Ed.2d* at 315. See *Sosna v. Iowa,* 419 *U.S.* 393, 95 *S.Ct.* 553, 42 *L.Ed.2d* 532 (1975); *Vlandis v. Kline,* 412 *U.S.* 441, 452–453 n.9, 93 *S.Ct.* 2230, 2236–2237 n.9, 37 *L.Ed.2d* 63, 72 n.9 (1973); *Shapiro v. Thompson,* 394 *U.S.* 618, 638 n.21, 89 *S.Ct.* 1322, 1333, 22 *L.Ed.2d* 600, 617 n.21 (1969).

The analysis does not end with this determination, however. The individual interests affected by the residency requirement convince us that under federal constitutional law, something more than mere rationality is necessary to support the require-

---

[7]For the purposes of this discussion, we assume without deciding that this right includes *intra-state* as well as *interstate* travel, and that Matthews may therefore raise the right to travel claim. See *King v. New Rochelle Municipal Housing Auth.,* 442 *F.*2d 646 (2d Cir. 1971), *cert.* den., 404 *U.S.* 863, 92 *S.Ct.* 113, 30 *L.Ed.2d* 107 (1971); *Eggert v. City of Seattle,* 81 *Wash.*2d 840, 505 *P.* 2d 801 (1973); see also *Abrahams v. Civil Serv. Comm'n,* 65 *N.J.* 61, 69 n.3 (1974).

ment. "Semantics aside, the question [must be] resolved judicially by determining what is more important to our form of government; the rights protected by the state law in question or the rights infringed by it." *Chimento*, 353 *F.Supp.* at 1214.

## C

As discussed above, the impact of a durational residency requirement for candidates on the right to vote, although indirect, is nevertheless a significant intrusion into the voter's freedom of choice. Since a residency requirement limits the number of potential candidates, there is an infringement of the right to vote despite the absence of discrimination against a particular class of voters. At the same time, we recognize the importance of legislative interests in maintaining the integrity of the electoral process. To permit the furtherance of these interests without unduly restricting the electorate's freedom of choice, we hold that a requirement or restriction for candidates for elective office must be reasonably and suitably tailored to further legitimate governmental objectives. We believe this to be consistent with the approach outlined in *Bullock* of "examin[ing] in a realistic light the extent and nature of [the] impact" on voters of barriers to candidacy. *Bullock*, 405 *U.S.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.2d* at 100. It also comports generally with this Court's approach to minimum age requirements for candidates in *Wurtzel v. Falcey, supra.*[8] See also *Gangemi*, 44 *N.J.* at 171.

We do not agree with the dissent's view that *Bullock v. Carter* applied strict scrutiny, see *post* at 176–177 (Clifford, J., dissenting), nor do we find support for that proposition in the cases relied upon by it, *Massachusetts Bd. of Retirement v. Murgia*,

---

[8]In that case, we sustained the provision in our State Constitution setting a minimum age of 21 years for members of the Assembly and 30 years for State Senators, *N.J. Const.* (1947) Art. IV, § I, par. 2, as a "reasonable" means of promoting the "State's interest in maintaining the integrity of the ballot by ensuring competent candidates." 69 *N.J.* at 404. In contrast to the present case, there was not further classification issue raised because all voters in the State were treated the same.

.

427 *U.S.* 307, 96 *S.Ct.* 2562, 49 *L.Ed.*2d 520 (1976); *Lubin v. Panish*, 415 *U.S.* 709, 94 *S.Ct.* 1315, 39 *L.Ed.*2d 702 (1974). In *Massachusetts Bd. of Retirement v. Murgia*, the Court referred to *Bullock* solely for the proposition that the right to vote is a fundamental right. 427 *U.S.* at 312 n.3, 96 *S.Ct.* at 2566 n.3, 49 *L.Ed.*2d at 524 n.3. The Court in *Panish* utilized the same intermediate test applied in *Bullock*. *Compare Bullock v. Carter*, 405 *U.S.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100 ("[T]he Texas filing-fee scheme . . . must be 'closely scrutinized' and found *reasonably necessary to the accomplishment of legitimate state objectives* in order to pass constitutional muster." (citation omitted) (emphasis added)), *with Lubin v. Panish*, 415 *U.S.* at 718, 94 *S.Ct.* at 1321, 39 *L.Ed.*2d at 710 ("Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not *reasonably necessary to the accomplishment of the State's legitimate election interests.*" (emphasis added)).

## III

We begin application of this standard of constitutional scrutiny by assessing the State interests that the two-year requirement of *N.J.S.A.* 40:72–1 assertedly furthers. Like age, residence, or citizenship restrictions on public office holding, see *Wurtzel*, 69 *N.J.* at 403, a durational residency requirement is directed at maintaining the integrity of the ballot by preventing fraudulent and frivolous candidacies. It ensures that candidates have some knowledge of local affairs and, conversely, that local voters have an opportunity to learn about a candidate to intelligently assess his fitness for office. Properly drawn, a durational residency requirement is directed at providing a sufficient period of time for these two "educational" functions to take place.

Protecting the integrity of the ballot is a valid governmental objective. See *Bullock v. Carter*, 405 *U.S.* at 145, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 101; *Jenness v. Fortson*, 403 *U.S.* 431, 442, 91 *S.Ct.* 1970, 1976, 29 *L.Ed.*2d 554, 562–563. The power to prescribe qualifications for state political office, retained by the

states under the Tenth Amendment, see *Oregon v. Mitchell,* 400 *U.S.* 112, 91 *S.Ct.* 260, 27 *L.Ed.*2d 272 (1970), is a permissible means by which to further this objective. The exercise of this power, however, remains subject to the requirements imposed on the states by other provisions of the federal constitution—including the Equal Protection Clause. *Turner v. Fouche, supra.*

■ Once a residency requirement is found justified, the precise time period selected by the Legislature need only fall within a reasonable range. A more stringent requirement would place upon the State the virtually impossible burden of showing that a particular number of months or years, as opposed to some other length of time, is constitutionally permissible. "[T]o test the power to establish * * * qualification[s] by the 'compelling interest' standard is really to deny a State any choice at all, because no State could demonstrate a 'compelling interest' in drawing the line * * * at one point rather than another." *Oregon v. Mitchell,* 400 *U.S.* 112, 294–295, 91 *S.Ct.* 260, 349, 27 *L.Ed.*2d 272, 379 (1970) (Stewart, J., concurring in part and dissenting in part). After determining that the Legislature has selected a reasonable time period, our inquiry is at an end.

■ We need not resolve whether a two-year residency requirement passes constitutional muster. The alleged justifications for the residency requirement, *N.J.S.A.* 40:72–1, lose meaning when it is observed that the statute applies to only 40 out of 567 municipalities in the State with commission form of government. See Fitzgerald, *Legislative Manual* 891–904 (1980)[9]. In *Gangemi v. Rosengard, supra,* the plaintiff challenged the requirement in *N.J.S.A.* 40:69A–167.1 that elected officers in cities of the first class governed by the Faulkner Act be "registered voters" for at least two years. Elective offices in other Faulkner Act municipalities had no such durational requirement. In a

---

[9]Eight municipalities have a "1923 Council-Manager" form of government under which there is a two-year residency requirement for councilmen in municipalities with a population of 1,000 or more and 90 days if the population is under 1,000. *N.J.S.A.* 40:81–1; see Fitzgerald, *supra,* at 891–904.

unanimous decision, the Court struck down the requirement as violative of equal protection.

The *Gangemi* Court noted that the statute embodied a "triple test" for determining its applicability:

> [It] applies only to (1) a city and then only (2) if the city is of the first class (meaning a city with a population exceeding 150,000; *R.S.* 40:167–2); and even then, only (3) if the city has adopted one of the sundry and somewhat diverse plans authorized by the Faulkner Act. [44 *N.J.* at 174]

The Court observed the fact that only two municipalities—Jersey City and Newark—actually met that test was "not necessarily decisive, since a statute could conceivably deal with a problem peculiar to them because of their population and form of government." *Id.* However, the statute's classification lacked the "critical connection" to the object of the law. *Id.* at 175.

> The purpose of the two-year registration provision being * * * to assure an adequate interest in or understanding of civil affairs, *the question is why like assurance is not equally appropriate to all municipalities*; or why, if population is relevant, it should matter that the municipality is or is not a city; or why it should matter whether the municipality has or has not adopted one of the plans of government authorized by the Faulkner Act. We cannot conceive a rational connection between the supposed aim of the law and class of municipalities to which its operation is limited. We cannot understand why a right so fundamental as the right to vote should be thus restricted in two of the State's 567 municipalities because they adopted a Faulkner plan of government. We must therefore find the two-year registration provision is invalid. [44 *N.J.* at 175 (emphasis added and footnote omitted)]

These observations apply with equal force here. In an attempt to distinguish *Gangemi*, the State and intervenors contend that the two-year requirement in this case is justified by differences in the authority wielded by commissioners under the Walsh Act; they possess executive and administrative as well as legislative powers. *N.J.S.A.* 40:72–2. This argument is unpersuasive. Although municipalities may differ widely in their governmental structure, those differences cannot support distinctions among residency requirements under the various forms of local government. The vast majority of municipalities have *no* durational residency requirement for candidacy.[10] There has

---

[10]See *N.J.S.A.* 40:87–1 to –14 (boroughs); 40:125–2 (towns); 40:145–2 (townships); 40:159–1 (villages).

been no showing that because of the structure of the governing body in Walsh Act municipalities, an additional two years is reasonably necessary for a candidate to become familiar with local problems or for the voters to become familiar with the candidate. No other justification for this distinction has been advanced, nor does one exist. As a class, Walsh Act municipalities do not differ from others in terms of their size, location or geography.

Because the right to vote is fundamental, the State has the affirmative burden of justifying why voters in some municipalities may vote only for candidates satisfying a two-year residency requirement while voters in other municipalities are not so restricted. It has failed to provide any sound justification why municipalities under the Walsh Act and other forms of local government should be treated differently. It is for this reason the statute must fail. *Cf. Gangemi v. Rosengard,* 44 *N.J.* at 175. The importance of the rights affected by the differing treatment of candidate eligibility prevents the Legislature from attacking the problem "one step at a time," see *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 *U.S.* 483, 75 *S.Ct.* 461, 99 *L.Ed.* 563 (1955). Although some conceivable basis might be hypothesized which could sustain this differential treatment under minimal judicial scrutiny, the standard of review we have adopted today leaves no room for such speculation.

## IV

Based on the foregoing, we conclude that the durational residency requirement at issue violates the Equal Protection

---

*N.J.S.A.* 40:69A–167.1 requires that elected officers of cities of the first class with one of the Faulkner Act forms of government (Newark and Jersey City), be residents of the municipality for two years before election. This provision was not passed upon in *Gangemi, supra,* but was found unconstitutional on the basis of that decision in *Cherrick v. Smith,* 148 *N.J.Super.* 299 (App.Div.1977).

We note that Senate Bill 1282, presently under consideration by the Legislature, would provide for a uniform one-year durational residency requirement for all local offices. It would also require that the candidate be "registered to vote in the local unit to which the office pertains."

Clause of the Fourteenth Amendment. Since there is no dispute as to plaintiff's eligibility under the 40 days' residency presently required for public office in Atlantic City, Matthews is entitled to have his name placed on the ballot for election to the office of city commissioner. The judgment of the Appellate Division is therefore reversed.

SULLIVAN, J. (concurring in result).

I agree that the two-year residency requirement of the Walsh Act should be stricken, but would do so on the ground that in this day and age a two-year period no longer subserves the purpose of a residency requirement as outlined in *Stothers v. Martini*, 6 *N.J.* 560 (1951). In 1911, when the Walsh Act was originally enacted, the pace of life was slower, means of transportation and travel were not what they are today and persons did not change their residences as frequently as they do at the present time. The increasing transience of the average individual today, however, calls for reconsideration of extended residency requirements such as the one here involved. I would hold that a two-year period, such as the Walsh Act calls for, is unduly burdensome and restrictive.

I do not consider that equal protection is involved. When Atlantic City established its present form of government in 1912, it did so by vote of its electorate. It could have adopted another form of government, one which did not have a two-year residency requirement for its elected governing body. It chose to incorporate under the provisions of the Walsh Act. At all times it has retained the right to change its form of government and thereby eliminate the two-year residency requirement. Indeed, as recently as February 26, 1980, the electorate in Atlantic City, at a special election, rejected an effort to have the Walsh Act form of government changed. Under these circumstances, I do not see an equal protection basis for invalidating the two-year residency requirement. See *Jamouneau v. Harner*, 16 *N.J.* 500, 521 (1954).

CLIFFORD, J., dissenting.

By manufacturing a "three-tier" analysis of equal protection claims the Court has created a veil of tiers which shrouds this essential issue: whether the two-year residency requirement for municipal office here is reasonably related to legitimate government objectives. I would hold that it is.

The provision under attack is found in *N.J.S.A.* 40:72–1, part of the Walsh Act, which sets forth the commission form of government. It requires that "[e]ach member [of the municipal governing body] shall have been a citizen and resident of the municipality for at least two years immediately preceding his election." Almost thirty years ago this precise durational residency requirement was upheld in the face of constitutional attack. *Stothers v. Martini*, 6 *N.J.* 560 (1951). In *Stothers*, this Court held that the legislature is free to prescribe reasonable qualifications for elective municipal offices and that the very same requirements challenged here are "wholly proper" when measured against the traditional rational basis test. *Id.* at 567. Fifteen years ago this Court acknowledged the correctness of *Stothers*. *Gangemi v. Rosengard*, 44 *N.J.* 166, 172 (1965). *See also Hardy v. Ruhnke*, 47 *N.J.* 10, 24 (1966). The rational basis test used in *Stothers* was again applied in *Wurtzel v. Falcey*, 69 *N.J.* 401 (1976), to uphold age requirements for political candidates.

Now, with the most recent of these well-reasoned cases on the books a mere four years, the majority overrules them. By applying a more exacting test than the traditional rational basis test used in *Stothers* and *Wurtzel*, the majority disembowels these two cases. In place of the rational basis test—the test generally applied to constitutional challenges to candidate eligibility requirements, L. Tribe, *American Constitutional Law* §§ 13–19 (1978)—the majority resorts to an intermediate standard of review. The authority for this constitutional innovation is said to be found in *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.*2d 274 (1972), and *Bullock v. Carter*, 405 *U.S.* 134, 92 *S.Ct.* 849, 31 *L.Ed.*2d 92 (1972).

However, those cases do not furnish the support claimed for them. *Dunn*, which involved a challenge to durational residency requirements for the right to vote, is readily distinguishable on its facts. It is well established that while the right to vote is a fundamental right, the right to run for office is not—as both the majority and dissenting opinions in *Wurtzel, supra*, took pains to emphasize. See 69 *N.J.* at 403 and *id.* at 407 (Pashman, J., dissenting). *Bullock* involved a filing fee requirement for political candidates. The Court found that the filing fee created "barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose." 405 *U.S.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. Strict scrutiny was applied because of the requirement's direct relation to the resources of the voters. The fee requirement accorded unequal weight based on economic status and denied the voters the opportunity to vote for a candidate from their socio-economic group. In later cases the Court cites *Bullock* as an example of the type of case which calls for strict scrutiny because a legislative classification impermissibly interferes with the exercise of a fundamental right, *Massachusetts Bd. of Retirement v. Murgia*, 427 *U.S.* 307, 312 n.3, 96 *S.Ct.* 2562, 2566 n.3, 49 *L.Ed.*2d 520, 524 (1976), *not* as an example of an intermediate scrutiny case as the majority uses it here. The United States Supreme Court also describes *Bullock* as involving "filing fees that were so patently exclusionary as to violate traditional equal protection concepts." *Lubin v. Panish*, 415 *U.S.* 709, 715 n. 4, 94 *S.Ct.* 1315, 1319 n.4, 39 *L.Ed.*2d 702, 708 (1974). In *Lubin*, a more recent case involving filing fees for political candidates, the Court distinguished *Bullock* on its facts and applied the rational basis test. *Id.* at 718, 94 *S.Ct.* at 1321, 39 *L.Ed.*2d at 710.

For the very reasons that the United States Supreme Court has refused to extend the reasoning of *Bullock*, I would not apply it to the facts here. Where legislative distinctions are not predicated on wealth or race and there is no substantial impact on the ability to exercise the fundamental right to vote, strict scrutiny is not applicable to election cases. *McDonald v. Board*

*of Election,* 394 *U.S.* 802, 89 *S.Ct.* 1404, 22 *L.Ed.*2d 739 (1969). *See also Hill v. Stone,* 421 *U.S.* 289, 297, 95 *S.Ct.* 1637, 1643, 44 *L.Ed.*2d 172, 179, *reh. den.,* 422 *U.S.* 1029, 95 *S.Ct.* 2617, 45 *L.Ed.* 2d 686 (1975).

In applying the rational basis test, I am satisfied that the imposition of a two year residency requirement as a prerequisite for holding elective office in a Walsh Act community is well within the legislative prerogative. As noted by the trial judge here,

> the durational residency requirement insures that the prospective candidate has been exposed to the local government and its people and he is thereby familiar with and aware of the conditions, needs and problems of that government. It also gives the voters of the government an opportunity to gain by observation and personal contact some firsthand knowledge of the candidate for those local offices. Additionally, it serves to prevent frivolous candidacies by persons who had little previous exposure to the problems and desires of the local citizens. Residency requirements have always been thought to be a necessary means of achieving the goal of knowledgeable and qualified people in high public office as evidenced by the requirements for the various public offices in the U.S. and State Constitutions. Furthermore, durational residency requirements at least allows the prospective candidate to fulfill their obligation to become familiar with the wishes of their constituents.

Additionally, as pointed out by the intervenors-respondents, the substantive distinctions between the powers, duties and responsibilities of Walsh Act Commissioners and those of council members elected under the Optional Municipal Charter Law, *N.J.S.A.* 40:69A–1 to –210, known as the Faulkner Act, are sufficiently clear to support a legislative determination of the need for a durational residency requirement in a Walsh Act municipality. Walsh Act Commissioners have much greater executive and administrative powers and responsibilities, in addition to other legislative and judicial functions, than do Faulkner Act council members.[1] The Walsh Act contemplates the division of authority and imposition of individual responsibility in departmental work. Each commissioner is assigned the responsibility for a single department, *N.J.S.A.* 40:72–4, and is

---

[1]For an informative discussion of the development of the commission form of government culminating in the Walsh Act, see *Grogan v. DeSapio,* 11 *N.J.* 308 (1953).

accountable for its functioning.  See *Pashman v. Friedbauer*, 1 *N.J.Super.* 616, 618 (Law Div.), aff'd, 4 *N.J.Super.* 123 (App.Div. 1949).  See also *Oliver v. Daly*, 103 *N.J.L.* 52 (E. & A. 1926), for the types of problems to be encountered by the commissioners in the operation of their respective departments.  Whereas in Faulkner Act communities council members make collective decisions, acting in a collegial fashion, the commissioners in Walsh Act municipalities are called upon to exercise individual decision-making functions.

Whether these individual responsibilities in turn are such as to require the conclusion that there is a concommitant necessity in Walsh Act communities for greater exposure to the conditions, needs and problems of the people and government of the municipality we need not decide.  The question is simply whether the legislature might reasonably have reached that conclusion, whether we agree with it or not.  It seems to me beyond argument that the legislature could have decided that the two year durational residence requirement of *N.J.S.A.* 40:72–1 ensures that the candidate for commissioner will have been present in the community for at least that period, thereby affording him the opportunity to learn of its conditions and needs and to become aware of any abuses and inefficiencies requiring correction.  It could likewise have determined that at the same time the voters will be allowed to gain some first-hand knowledge of the candidate, the better to help decide whether he is competent to discharge the duties of a commissioner.

Accordingly, I would give effect to the statute [2] and affirm the trial court's judgment upholding the constitutionality of the two year durational residency requirement in Walsh Act communities.

Justice POLLOCK joins in this dissenting opinion.

---

[2] It is interesting to observe in passing that even if Senate Bill 1282, to which the Court makes reference, *ante* at 172 *n.* 10, were law and applicable to this case, Matthews would be ineligible to run for city commissioner in Atlantic City, inasmuch as he could not satisfy that bill's requirement of one year residency.

SULLIVAN, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices SULLI-VAN, PASHMAN, SCHREIBER and HANDLER—5.

*For affirmance*—Justices CLIFFORD and POLLOCK—2.